[No. S076262. Aug. 23, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
LEBARRON KEITH WILLIAMS, Defendant and Appellant.

## Counsel

Madeline McDowell, under appointment by the Supreme Court; and Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General,

Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—Thirty years ago, we examined the mental state for assault and concluded assault requires only a general criminal intent and not a specific intent to cause injury. (*People v. Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372] (*Rocha*).) Seven years ago, we reaffirmed *Rocha* and reiterated that assault was a general intent crime. (*People v. Colantuono* (1994) 7 Cal.4th 206, 215-216 [26 Cal.Rptr.2d 908, 865 P.2d 704] (*Colantuono*).) We further explained that the "mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery." (*Id.* at p. 214.) Today, we once again clarify the mental state for assault and hold that assault requires actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another. In light of this clarification, any technical error in the instructions given was harmless.

FACTS

Gregory King and Deborah Nicholson married in 1989. Their marriage lasted only about two weeks, but they continued to have sexual relations. In 1992, Nicholson became romantically involved with defendant Lebarron Keith Williams. Nicholson had a son in November 1994, but did not know which of the two men had fathered the child. After the child's birth, defendant and King continued to compete for Nicholson's affections. Their rivalry resulted in several confrontations culminating in this case.

Prior to the confrontation at issue here, King repeatedly telephoned Nicholson, trying to persuade her to accompany him and his two teenage sons on an outing. When Nicholson disconnected her phone, King drove to Nicholson's home with his sons and parked his compact pickup truck at the front curb. Defendant's pickup truck was in the driveway. King walked up to Nicholson's front door and put a note on the door. He then knocked and returned to his truck, hoping Nicholson would come out and talk to him.

Defendant opened the door and told King to stay away from Nicholson. Defendant then walked to his own truck and removed a shotgun, which he loaded with two 12-gauge shotgun rounds. Defendant walked back toward the house and fired, in his words, a "warning shot" directly into the rear

passenger-side wheel well of King's truck. Defendant testified that, at the time he fired the shot, King's truck was parked between him and King, and that he saw King crouched approximately a foot and a half away from the rear fender well of the truck. Defendant further testified that he never saw King's sons before he fired and only noticed them afterwards standing on a curb outside the immediate vicinity of King's truck. King, however, testified that both of his sons were getting into the truck when defendant fired.

Although defendant did not hit King or King's sons, he did hit the rear tire of King's truck. The shotgun pellets also left marks on the truck's rear wheel well, its undercarriage, and its gas tank.

Defendant was charged with one count of shooting at an occupied motor vehicle (Pen. Code, § 246)[1], and three counts of assault with a firearm (§ 245, subd. (a)(2)), one count each for King and his two sons. Each count carried an allegation of personal firearm use. (§ 12022.5, subd. (a)(1).) The trial court gave the standard jury instruction on assault. (Former CALJIC No. 9.00 (1994 rev.) (5th ed. 1995 supp.).) That instruction provides in pertinent part that the crime of assault requires proof of these elements: "1. A person willfully and unlawfully committed an act that by its nature would probably and directly result in the application of physical force on another person; and [¶] 2. At the time the act was committed, such person had the present ability to apply physical force to the person of another." (*Ibid.*) The jury convicted defendant of assaulting King with a firearm, but deadlocked on the remaining counts. The trial court later dismissed the deadlocked counts in the interests of justice.

On appeal, the Court of Appeal found the assault instruction erroneous because the instruction incorrectly stated the mental state required for the offense. After finding the instructional error prejudicial, the court reversed defendant's assault conviction.

We granted review to clarify the mental state for assault.

DISCUSSION

I

The trial court instructed the jury that defendant was guilty of assault only if he "willfully and unlawfully committed an act that by its nature would probably and directly result in the application of physical force being applied to the person of another." (See former CALJIC No. 9.00, *supra.*) The Court

---

[1]All further statutory references are to the Penal Code.

of Appeal found this instruction erroneous because it described a mental state of negligence and allowed the jury to find defendant guilty if "under an objective view of the facts . . . an application of physical force on another person was reasonably foreseeable." Concluding that the instruction misstated the mental state for assault, the court held that assault requires either a desire to cause an application of physical force or substantial certainty that such an application would result. (See *People v. Smith* (1997) 57 Cal.App.4th 1470 [67 Cal.Rptr.2d 604] (*Smith*).)

The People urge us to reverse. They contend assault only requires general criminal intent, and the Court of Appeal improperly transformed assault into a specific intent crime by injecting the concepts of purpose and knowledge. As explained below, we agree that the Court of Appeal's description of the mental state for assault is erroneous and that assault is a general intent crime. We further conclude that assault requires actual knowledge of those facts sufficient to establish that the offending act by its nature would probably and directly result in physical force being applied to another.

Section 240—unchanged since its initial enactment in 1872—defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Over the decades, we have struggled to fit this 1872 definition of assault into our constantly evolving framework of criminal mental states. We first recognized this struggle in *People v. Hood* (1969) 1 Cal.3d 444, 452-459 [82 Cal.Rptr. 618, 462 P.2d 370] (*Hood*), where we held that a jury may not consider voluntary intoxication when determining whether a defendant committed assault. In *Hood*, we noted that the concepts of general and specific intent "were not yet terms of art" in 1872, and acknowledged that courts had struggled to fit the historic definition of assault into the modern framework of general and specific intent. (*Id.* at pp. 457-458.) Nonetheless, we declined to classify assault as a general or specific intent offense, because the "distinction between specific and general intent" did not resolve the issue of whether voluntary intoxication should be a defense to assault. (*Id.* at p. 458.)

Approximately one year later, we confronted the issue of the mental state for assault head-on. In *Rocha, supra*, 3 Cal.3d at page 899, we held that assault does not require the specific "intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm . . . . [Fns. omitted.]" Rather, assault required "the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." (*Ibid.*)

Twenty-three years later, we once again attempted to decipher "the requisite intent for assault and assault with a deadly weapon . . . ." (*Colantuono*,

*supra,* 7 Cal.4th at p. 213.) In *Colantuono,* we noted that *"Rocha* accurately focused on the violent-injury-producing nature of the defendant's acts, rather than on a separate and independent intention to cause such injury" but may have left a "measure of understandable analytical uncertainty." (*Colantuono,* at p. 215.) Hoping to resolve this uncertainty, we reaffirmed that assault "is a general intent crime"—and not a specific intent crime. (*Id.* at p. 216, fn. omitted.) "The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm." (*Id.* at p. 218, fn. omitted.) We also reiterated that " '[r]eckless conduct alone does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another.' " (*Id.* at p. 219, quoting *People v. Lathus* (1973) 35 Cal.App.3d 466, 469 [110 Cal.Rptr. 921]; see also *People v. Carmen* (1951) 36 Cal.2d 768, 776 [228 P.2d 281].)

Although we conclusively classified assault as a general intent crime in *Colantuono,* we have recently recognized that such a classification, by itself, may not fully describe the requisite mental state for every criminal offense. (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 2, pp. 199-201 [despite "universal acceptance of the principle that general criminal intent is required," courts have often struggled to define the requisite mental state for criminal offenses].) Thus, in *People v. Hering* (1999) 20 Cal.4th 440, 445 [84 Cal.Rptr.2d 839, 976 P.2d 210] (*Hering*), we cautioned against the rote application of the general/specific intent framework. We have also suggested that "[s]uch classification of offenses is necessary 'only when the court must determine whether a defense of voluntary intoxication or mental disease, defect, or disorder is available . . . .' " (*People v. Rathert* (2000) 24 Cal.4th 200, 205 [99 Cal.Rptr.2d 779, 6 P.3d 700].) The apparent confusion engendered by *Colantuono* suggests that assault may be such a case.

With this in mind, we revisit the mental state for assault. ■ As always, we begin with the statute and seek to ascertain the Legislature's intent at the date of enactment. (See, e.g., *People v. Garcia* (2001) 25 Cal.4th 744, 758 [107 Cal.Rptr.2d 355, 23 P.3d 590] [courts must determine the drafter's intent at the time of enactment].) Assault is "an unlawful *attempt,* coupled with a present ability, to commit a violent injury on the person of another." (§ 240, italics added.) Because section 240 was enacted in 1872 and has not been amended, we must construe the Legislature's intent as of 1872.

To ascertain the mental state for assault, we must first determine the meaning of the term "attempt." In 1872, attempt apparently had three possible definitions: (1) "[a]n endeavor to accomplish a crime carried beyond mere preparation, but falling short of execution of the ultimate design

in any part of it" (1 Bouvier's Law Dict. (1872) p. 166); (2) "[a]n intent to do a thing combined with an act which falls short of the thing intended" (*ibid.*); and (3) "an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences" (*ibid.*). With respect to mental states, the third definition requires only an intent to commit the act—and not a specific intent to obtain some further objective—and focuses on the objective nature of that act. The first definition is ambiguous. It focuses on the nature of the act but may or may not require an intent to "accomplish a crime." (*Ibid.*) The second definition appears to describe the traditional formulation of criminal attempt later codified in section 21a, which requires a specific intent.

In determining which meaning of "attempt" the Legislature intended to use in section 240, we must look to the historical "common law definition" of assault. (Code commrs. note foll. Ann. Pen. Code, § 240 (1st ed. 1872, Haymond & Burch, commrs.-annotators) pp. 104-105.) " 'The original concept of criminal assault developed at an earlier day than the doctrine of criminal attempt in general. . . .' " (*Colantuono, supra,* 7 Cal.4th at p. 216, quoting Perkins on Criminal Law (2d ed. 1969) ch. 2, § 2, pp. 118-119.) Assault "is not simply an adjunct of some underlying offense [like criminal attempt], but an independent crime statutorily delineated in terms of certain unlawful conduct immediately antecedent to battery." (*Colantuono,* at p. 216.) Unlike criminal attempt where the " 'act constituting an attempt to commit a felony may be more remote,' " " '[a]n assault is an act done toward the commission of a battery' " and must " 'immediately' " precede the battery. (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 164 (Perkins).) Indeed, our criminal code has long recognized this fundamental distinction between criminal attempt and assault by treating these offenses as *separate and independent* crimes. (Compare § 240 with §§ 663, 664.)

Consequently, criminal attempt and assault require different mental states. Because the act constituting a criminal attempt "need not be the last proximate or ultimate step toward commission of the substantive crime," criminal attempt has always required "a specific intent to commit the crime." (*People v. Kipp* (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) In contrast, the crime of assault has always focused on the nature of the act and not on the perpetrator's specific intent. An assault occurs whenever " '[t]he next movement would, *at least to all appearance,* complete the battery.' " (Perkins, *supra,* p. 164, italics added.) Thus, assault "lies on a definitional . . . *continuum of conduct* that describes its essential relation to battery: An assault is an incipient or inchoate battery; a battery is a consummated assault." (*Colantuono, supra,* 7 Cal.4th at p. 216, italics added.) As a result, a *specific intent* to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent.

The term "attempt" as used in the 1872 assault statute therefore does not refer to a definition of attempt that requires a specific intent, such as the definition later codified in section 21a.[2] Rather, the Legislature, consistent with the historical understanding of assault, presumably intended to adopt the third 1872 definition of attempt: "an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences . . . ." (1 Bouvier's Law Dict., *supra*, at p. 166.) Thus, we explained in *Colantuono* that "the mental state for assault . . . is established upon proof the defendant willfully committed an act that *by its nature will probably and directly result* in injury to another, i.e., a battery." (*Colantuono*, *supra*, 7 Cal.4th at p. 214, italics added; see also *Rocha*, *supra*, 3 Cal.3d at p. 899 ["the criminal intent which is required for assault . . . is the general intent to wilfully commit an act *the direct, natural and probable consequences of which, if successfully completed*, would be the injury to another" (italics added)].)

Although *Colantuono*'s description of the mental state for assault reflects the meaning of "attempt" intended by the Legislature in 1872, its exclusive reliance on the concept of general intent has resulted in some confusion. (See *Hering*, *supra*, 20 Cal.4th at p. 445.) We may attribute much of this confusion to the fact that "[t]he gravamen [of assault] . . . is the *likelihood* that the force applied or attempted to be applied will result in great bodily injury." (*People v. McCaffrey* (1953) 118 Cal.App.2d 611, 618-619 [258 P.2d 557], some italics omitted.) Because assault criminalizes conduct based on what *might* have happened—and not what *actually* happened—the mental state for assault incorporates the language of probability, i.e., direct, natural and probable consequences. This language, however, arguably implies an objective mental state consistent with a negligence standard. (See *Smith*, *supra*, 57 Cal.App.4th at p. 1480.)

Recognizing that *Colantuono*'s language may have been confusing, we now clarify the mental state for assault. ▮ Based on the 1872 definition of attempt, a defendant is only guilty of assault if he intends to commit an act "which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences." (1 Bouvier's Law Dict., *supra*, at p. 166.) Logically, a defendant cannot have such an

---

[2]In reaching this conclusion, we acknowledge that parts of the code commissioners comment to section 240 suggest that assault requires a specific intent to injure. (See Code commrs. note foll. Ann. Pen. Code, § 240, *supra*, at pp. 104-105.) We do not, however, find these parts of the comment compelling in light of the historic conception of assault and the Legislature's decision to make assault a statutorily distinct crime from criminal attempt. (See *ante*, at pp. 785-786.) Indeed, the Legislature could have omitted assault from the Penal Code and allowed prosecutors to charge defendants with " 'attempted battery,' " if it wished to make assault a specific intent crime. (*Colantuono*, *supra*, 7 Cal.4th at p. 216.)

intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. (Cf. § 7, subd. 5 [actual knowledge means "a knowledge that the facts exist which bring the act or omission within the provisions of this code"].) In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur.[3]

In adopting this knowledge requirement, we do not disturb our previous holdings. ■ Assault is still a general intent crime (see *Colantuono, supra,* 7 Cal.4th at pp. 215-216; *Rocha, supra,* 3 Cal.3d at p. 899), and juries should not "consider evidence of defendant's intoxication in determining whether he committed assault" (*Hood, supra,* 1 Cal.3d at p. 459). Likewise, mere recklessness or criminal negligence is still not enough (see *Colantuono,* at p. 219),[4] because a jury cannot find a defendant guilty of assault based on facts he should have known but did not know (see *Walker v. Superior Court* (1988) 47 Cal.3d 112, 136 [253 Cal.Rptr. 1, 763 P.2d 852] ["criminal negligence must be evaluated objectively"]).

We also reaffirm that assault does not require a specific intent to injure the victim. (See *Rocha, supra,* 3 Cal.3d at p. 899.) As explained above, our rejection of a specific intent requirement is consistent with the statutory language and the historic conception of criminal assault. In any event, even if we erred 30 years ago in *Rocha* and compounded this error seven years ago in *Colantuono,* the Legislature's subsequent conduct strongly militates against any belated correction of this "error" today.

First, the legislative history behind section 21a—which codified the elements of criminal attempt for the first time—strongly suggests that the Legislature approved of *Rocha.* Section 21a provides that "[a]n attempt to commit a crime consists of two elements: a specific intent to commit the

---

[3]For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery.

[4]In stating that reckless conduct cannot constitute an assault, *Colantuono* relied on *People v. Lathus, supra,* 35 Cal.App.3d at page 469, which in turn relied on our 1951 decision in *People v. Carmen, supra,* 36 Cal.2d at pages 775-776, which in turn relied on even older case law. Thus, *Colantuono* meant "recklessness" in its historical sense as a synonym for criminal negligence, rather than its more modern conception as a subjective appreciation of the risk of harm to another. (See Dressler, Understanding Criminal Law (2d ed. 1995) Mens Rea, § 10.04[D][3], *pp. 115-116* ["In the past, 'recklessness' was a synonym for 'criminal negligence' "].)

crime, and a direct but ineffectual act done toward its commission." By enacting section 21a in 1986—15 years after our decision in *Rocha*—the Legislature merely intended to codify "the attempt definition now used in jury instructions." (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1668 (1985-1986 Reg. Sess.) as amended May 28, 1986, p. 5.) The Legislature did not intend to affect other jury instructions or overturn *Rocha* and its rejection of a specific intent requirement for assault. Indeed, the Legislature apparently intended section 21a to be "consistent with case law and other relevant authority"—which presumably included *Rocha*. (Assem. Com. Rep., *supra*, at p. 5.) Thus, the Legislature, by enacting section 21a, implicitly recognized that assault and criminal attempt were two statutorily independent offenses with different requisite mental states.

Second, the amendment of section 22 in 1982 provides additional evidence that the Legislature approved of *Rocha*. In 1982, the Legislature amended section 22 to make clear that voluntary intoxication could only negate specific intent and not general criminal intent. (Stats. 1982, ch. 893, § 2, p. 3317; see *People v. Whitfield* (1994) 7 Cal.4th 437, 448 [27 Cal.Rptr.2d 858, 868 P.2d 272] (*Whitfield*).) In making this amendment, the Legislature intended to preserve existing law, including *Hood*, which held that voluntary intoxication is not a defense to assault. (See *Whitfield*, at p. 448.) Thus, under the plain language of section 22, assault could not require a specific intent to cause injury. Otherwise, evidence of voluntary intoxication would be admissible to negate the requisite mental state for assault in contravention of *Hood*.

The Legislature's subsequent enactment of section 21a bolsters this conclusion. Section 21a unequivocally states that criminal attempt requires a specific intent. Thus, under section 22, evidence of voluntary°intoxication would be admissible with regard to whether a defendant had the requisite intent for a criminal attempt. If section 21a now defines the mental state for assault, then voluntary intoxication would be a defense to assault under section 22. Because the Legislature undoubtedly did not intend such a result (see *Whitfield*, *supra*, 7 Cal.4th at p. 448), the 1982 amendment of section 22 implicitly affirms *Rocha* and its rejection of a specific intent requirement.

Finally, the Legislature has had 30 years to amend section 240 and overturn *Rocha*, but has not done so. ■ While legislative inaction is not necessarily conclusive, the longevity of our holding in *Rocha*, our subsequent reaffirmation of *Rocha* seven years ago in *Colantuono*, and the existence of other legislative enactments implicitly approving *Rocha* indicate that the Legislature has acquiesced in our conclusion that assault does not require a specific intent. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular*

*Telephone Co.* (1999) 20 Cal.4th 163, 178 [83 Cal.Rptr.2d 548, 973 P.2d 527] [declining to overrule a judicial interpretation after decades of legislative inaction and the unanimity of our decisions restating that interpretation].) Under these circumstances, we "believe it is up to the Legislature to change it if it is to be changed." (*Ibid.*)

 Accordingly, we hold that assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.

## II

 We now turn to the jury instruction at issue in this case and find this instruction potentially ambiguous. Because "the test of natural and probable consequences is an objective one" (*Smith, supra,* 57 Cal.App.4th at p. 1480), merely requiring the jury to find that a defendant willfully and unlawfully committed an act that by its nature would probably and directly result in physical force being applied to the person of another may permit a conviction premised on facts the defendant *should have known but did not actually know.* Thus, under the instruction given, a jury could conceivably convict a defendant for assault even if he did not actually know the facts sufficient to establish that his act by its nature would probably and directly result in a battery.

Nonetheless, any instructional error is largely technical and is unlikely to affect the outcome of most assault cases, because a defendant's knowledge of the relevant factual circumstances is rarely in dispute. Indeed, this case corroborates this observation. Here, defendant admitted he loaded his own shotgun with two shotgun rounds. He further testified that he knew that King, the alleged victim, "was crouched on the far side of the truck between the rear fender and the cab." Finally, defendant admittedly fired a warning shot at King's truck even though he knew that King was in the near vicinity. In light of these admissions, defendant undoubtedly knew those facts establishing that his act by its nature would directly, naturally and probably result in a battery. The jury's deadlock on the other assault counts, in which defendant denied actual knowledge that the victims were near the truck when he fired his shotgun, further confirms that the jury was not misled. Accordingly, any minor ambiguity in the instruction was harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 7-10 [119 S.Ct. 1827, 1833-1834, 144 L.Ed.2d 35].)

DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Chin, J., concurred.

**KENNARD, J.**—I dissent.

This court last tried to define the mental state required for the crime of assault in *People v. Colantuono* (1994) 7 Cal.4th 206 [26 Cal.Rptr.2d 908, 865 P.2d 704] (*Colantuono*). There, a majority of this court held that assault, as defined in Penal Code section 240, is *not* a specific intent crime and does *not* require proof that the defendant intended to injure another person. (*Colantuono, supra,* at pp. 217-219.) I disagreed with that holding. Based on the plain meaning of the statutory definition of assault—"an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another" (Pen. Code, § 240)—and on the 1872 code commissioners' note to Penal Code section 240 (code commrs. note foll. Ann. Pen. Code, § 240 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 104) (stating that "[i]f there is no present purpose to do an injury, there is no assault"), I concluded that assault requires proof of an intent to injure another and that, for this reason, assault is a specific intent crime. (*Colantuono, supra,* at p. 226 (conc. & dis. opn. of Kennard, J.); *id.* at pp. 225-228.)

Because the *Colantuono* majority never clearly explained what the required mental state for assault *is,* but only what it *is not,* this court is again faced with the task of defining the mental state required for assault. Reexamining the issue, the majority now compounds the error in *Colantuono* by holding that a defendant, to be guilty of assault, need only be aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from the defendant's conduct, even though the defendant honestly but mistakenly believes that no battery is likely to result. (Maj. opn., *ante,* at p. 788 & fn. 3.) Once again, I disagree.

I

The majority begins its analysis by reciting the statutory definition of assault—"an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another" (Pen. Code, § 240)—and declaring that we should "seek to ascertain the Legislature's intent at the date of enactment." (Maj. opn., *ante,* at p. 785.) Because the current statutory definition of assault is unchanged since the Penal Code's enactment in 1872,

the majority asserts that "we must construe the Legislature's intent as of 1872." (*Ibid.*)

I agree with this approach. Indeed, it is the one I used in my dissent in *Colantuono, supra,* 7 Cal.4th 206.

To ascertain the Legislature's intent in 1872 when it enacted the statutory definition of assault as part of the original Penal Code, the majority relies on *the third of three definitions* of "attempt" in the 1872 edition of Bouvier's Law Dictionary as " 'an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences . . . .' " (Maj. opn., *ante,* at p. 786.) The majority asserts that this definition of "attempt" supports its conclusion that in 1872 the Legislature intended to require, as the mental state for assault, an intent to commit an act that would, if successfully completed, result in the injury of another as a direct, natural and probable consequence. (*Ibid.*)

The majority quickly dismisses the first and second definitions of "attempt" appearing in the 1872 edition of Bouvier's Law Dictionary, because these definitions inconveniently do nothing to support its position. Indeed, as applied to the crime of assault, both of these definitions of "attempt" lead to the conclusion that assault requires an intent to inflict a battery—that is, an intent to injure.[1] The majority has chosen Bouvier's third definition of attempt to construe Penal Code section 240 because that definition appears on quick reading to support this court's mistaken holding in *Colantuono, supra,* 7 Cal.4th 206. Whether it actually supports it, however, is questionable. If an "attempt" requires an "intent" to commit an act that "would be indictable if done," and if an assault is an "attempt" to commit a battery, then an assault must require an intent to commit an act that would be punishable as a battery—that is, an intent to apply force unlawfully to another or, in other words, an intent to injure the other.

Tellingly, the majority fails to cite one appellate decision or one text writer from the 1872 period applying Bouvier's third definition of attempt to the crime of assault, or any other evidence that any member of the 1872 Legislature was aware of or relied upon this definition of attempt as explaining that term's meaning in Penal Code section 240. The majority also must acknowledge that the meaning it gives to the term "attempt" in Penal Code section 240 cannot be given to the same word in other sections of the original 1872 Penal Code, such as sections 663 and 664. (Maj. opn., *ante,* at

---

[1] In the context of assault and battery, the term "injure" does not require bodily harm and includes any "least touching" that is wrongful or offensive to the person who receives it. (*Colantuono, supra,* 7 Cal.4th at p. 214, fn. 4.)

pp. 786-787.) In those sections, which apply to the crime of criminal attempt, the word "attempt" requires a specific intent or purpose to commit the target crime. (See Pen. Code, § 21a; *People v. Kipp* (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) The majority thus acknowledges its failure to apply a normal rule of statutory construction: " ' " '[I]dentical words used in different parts of the same act are intended to have the same meaning.' " ' " (*Department of Revenue of Ore. v. ACF Industries, Inc.* (1994) 510 U.S. 332, 342 [114 S.Ct. 843, 849, 127 L.Ed.2d 165]; accord, *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 979 [90 Cal.Rptr.2d 260, 987 P.2d 727]; *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 643 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) The majority asks us to believe, contrary to this rule, that the 1872 Legislature, when it adopted the original Penal Code by a single legislative act, intended that "attempt" would mean one thing in sections 663 and 664, and something quite different in section 240.

The majority dismisses as mistaken the code commissioners' comment to Penal Code section 240. (Maj. opn., *ante*, at p. 787, fn. 2.) In so doing, it flouts another rule of statutory construction: "When a statute proposed by the California Code Commission for inclusion in the Penal Code of 1872 has been enacted by the Legislature without substantial change, the report of the commission is entitled to great weight in construing the statute and in determining the intent of the Legislature." (*People v. Wiley* (1976) 18 Cal.3d 162, 171 [133 Cal.Rptr. 135, 554 P.2d 881].)

When they submitted their draft of the Penal Code to the Legislature, the code commissioners provided an extensive comment describing the crime of assault. Because the Legislature adopted without change the recommendation of the code commissioners, their comment deserves this court's attention and consideration. Their note to Penal Code section 240 states in relevant part: "INTENT TO STRIKE.—An assault has also been said to be an intentional attempt, by violence, to do an injury to the person of another. It must be *intentional.* If there is no present purpose to do an injury, there is no assault. There must also be an *attempt.* A purpose not accompanied by an effort to carry into immediate execution falls short of an assault. Thus no words can amount to an assault. But rushing towards another with menacing gestures, and with a *purpose to strike,* is an assault, though the accused is prevented from striking before he comes near enough to do so.—[Citations.] . . . So, where an Embassador exhibited a painting in the window of his house which gave offense to the crowd without, and defendant, among the crowd, fired a pistol at the painting at the very time when the Embassador and his servants were in the window to remove it, but did not intend to hurt any of them, and in fact did not. *Held,* that there being no intent to injure the

person there could be no conviction for an assault. [Citations.]" (Code commrs. note foll. Ann. Pen. Code, § 240, *supra*, pp. 104-105, italics in original.) Thus, the code commissioners have unambiguously declared their understanding that the crime of assault as codified in Penal Code section 240 requires the mental state of a *purpose to injure*.

The majority mentions the code commissioners' comment only as evidence that the Legislature sought to codify "the historical 'common law definition' of assault." (Maj. opn., *ante*, at p. 786.) The majority ultimately rests its argument about the intent of the 1872 Legislature on its assertion that the common law definition of assault did not require an intent to injure. But the majority is mistaken. As the commissioners' comment accurately indicates, at common law the crime of assault "was an attempt to commit a battery and nothing else" and therefore "the need for an intent to inflict such harm has been emphasized." (Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 159, 161.) The authors of another criminal law treatise make the same point: "An attempt to commit any crime requires a specific intent to commit that crime; and so assault of the attempted-battery sort requires an intent to commit a battery, i.e., an intent to cause physical injury to the victim." (LaFave & Scott, Criminal Law (2d ed. 1986) p. 692, fns. omitted.)

Turning to the majority opinion in *Colantuono, supra,* 7 Cal.4th 206, the majority here correctly observes that it "has resulted in some confusion." (Maj. opn., *ante*, at p. 787.) Seeking to end the confusion, the majority states that the mental state required for assault is knowledge of "those facts sufficient to establish that [the defendant's] act by its nature will probably and directly result in physical force being applied to another, i.e., a battery." (*Id.* at p. 788.) Acknowledging that the *Colantuono* majority stated that merely reckless conduct cannot constitute an assault (*Colantuono, supra,* at p. 219; see also *People v. Rocha* (1971) 3 Cal.3d 893, 898 [92 Cal.Rptr. 172, 479 P.2d 372] (*Rocha*)), the majority here assures us that under the standard it adopts "mere recklessness or criminal negligence is still not enough" (maj. opn., *ante*, at p. 788), and this is because "a jury cannot find a defendant guilty of assault based on facts he should have known but did not know" (*ibid.*). I do not agree that the majority's formulation requires a mental state more culpable than criminal negligence or recklessness.

Criminal negligence is determined by an objective standard based on whether a reasonable person *in the defendant's position* would have been aware of the risk of harm to another. (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 [20 Cal.Rptr.2d 341, 853 P.2d 507].) To be "in the defendant's position" means, among other things, to be aware of the facts that the defendant knew. (*Albrecht v. Broughton* (1970) 6 Cal.App.3d 173, 179 [85

Cal.Rptr. 659]; see BAJI No. 3.11 (8th ed. 1994).) Thus, criminal negligence requires actual knowledge of facts that would lead a reasonable person to conclude that the conduct in question involved a high risk of injury to another. (See LaFave & Scott, Criminal Law, *supra*, at pp. 235-237.) Recklessness, a mental state more culpable than criminal negligence, requires not only knowledge of the facts making the conduct excessively dangerous, but also a subjective appreciation of the risk of harm to another. (*Id.* at p. 239; see also Pen. Code, § 450, subd. (f) [" 'Recklessly' means a person is aware of and consciously disregards a substantial and unjustifiable risk . . . ."]; *People v. Budish* (1982) 131 Cal.App.3d 1043, 1047 [182 Cal.Rptr. 653]; Perkins & Boyce, Criminal Law, *supra,* at p. 851.)

Thus, the *Colantuono* majority, in requiring *more than* criminal negligence or recklessness, must have intended to require not only knowledge of facts making the conduct dangerous and a subjective appreciation of the risk of injury to another, but also an awareness of a *higher degree of risk* than that required for ordinary criminal negligence or recklessness. The majority here, in holding that a subjective appreciation of the risk of harm is *not* required, is not faithful to *Colantuono*, much less to the plain meaning of the statutory definition of assault or the intent of the 1872 Legislature that enacted that definition, as reflected in the code commissioners' comment to Penal Code section 240.

As its last line of defense, the majority asserts that the Legislature has twice signaled its approval of this court's muddled decision in *Rocha, supra,* 3 Cal.3d 893, holding that assault with a deadly weapon was not a specific intent crime and stating that the intent required for assault is "the intent to attempt to commit a battery." (*Id.* at p. 899.) The majority declares that the Legislature implicitly approved *Rocha* in 1982 when it amended Penal Code section 22 to clarify that voluntary intoxication is admissible only on "whether or not the defendant actually formed a required specific intent," and again in 1986 when it adopted Penal Code section 21a, defining the elements of criminal attempt. (Maj. opn., *ante,* at p. 789.)

But the definition of attempt in Penal Code section 21a—as requiring "a specific intent to commit the crime"—is entirely inconsistent with the majority's construction of the same word in Penal Code section 240 defining assault. How the Legislature's adoption of this inconsistent definition of a key term in Penal Code section 240 constitutes an approval of *Rocha* or of what the majority does here today escapes me entirely. Nor do I see anything in Penal Code section 22 that supports the majority's decision here or suggests that the Legislature was thinking of the definition of assault in 1982 when it amended that section.

Finally, and unlike the majority, I attach no significance to the Legislature's failure to amend Penal Code section 240 after this court's decisions in *Rocha, supra,* 3 Cal.3d 893, and *Colantuono, supra,* 7 Cal.4th 206. Legislative inaction is normally a poor indicator of legislative intent. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873]; *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 902, fn. 5 [218 Cal.Rptr. 313, 705 P.2d 886] ["the Legislature's mere failure to respond to a judicial construction of its statute is no evidence of its acquiescence in the ruling"].) This is especially true in this instance. Since it first defined the crime in 1850 (Stats. 1850, ch. 99, § 49, p. 234), using language that passed unchanged into the 1872 Penal Code, the Legislature has never amended its definition of assault. It did not do so after this court defined assault to require a purpose to injure (*People v. Bird* (1881) 60 Cal. 7, 8; *People v. Dodel* (1888) 77 Cal. 293, 294 [19 P. 484]; *People v. McCoy* (1944) 25 Cal.2d 177, 189-190 [153 P.2d 315]; *People v. Wilson* (1967) 66 Cal.2d 749, 765 [59 Cal.Rptr. 156, 427 P.2d 820]; *People v. Coffey* (1967) 67 Cal.2d 204, 221-222 [60 Cal.Rptr. 457, 430 P.2d 15]), and it has not done so since this court has held assault does not require a purpose to injure. Throughout this contradictory course of judicial construction, the Legislature has allowed the statutory definition of assault to remain an attempt to commit a violent injury. In 1850, "attempt" meant what it meant at common law, namely that one "commits an attempt when, with intent to commit a particular crime, he performs an act which tends toward but falls short of the consummation of such crime." (4 Wharton's Criminal Law (15th ed. 1996) § 693, p. 580.)[2]

How far this court has strayed from the Legislature's definition of assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"! (Pen. Code, § 240.) Under the definition of assault that the majority approves today, as the Attorney General was forced to acknowledge at oral argument in this case, a trial court instructing a jury in the exact words of this statute would not accurately define the crime of assault.

## II

Here, the instruction that the trial court gave to the jury to explain the requirements for the crime of assault failed to state that assault requires either an intent to injure or a subjective awareness of the risk of injury. (See

---

[2] I do not mean to suggest that the Legislature should not reexamine its definition of the crime of assault. Given developments in other jurisdictions, and this court's own difficulties with the existing definition, such an examination may be overdue. As the authors of a treatise on criminal law in this country have observed, the common law definition of assault, as codified in *Penal Code* section 240, was once very common but now "is rarely found in the modern codes." (LaFave & Scott, Criminal Law, *supra,* at p. 691.)

maj. opn., *ante*, at p. 783.) In my view, therefore, the instruction was erroneous.

On the evidence presented here, this error was prejudicial. Defendant testified that when he fired his shotgun he was aiming at the rear passenger-side wheel well of Gregory King's truck, and not at King, and it was undisputed that none of the shotgun pellets hit King, who was standing on the opposite side of his truck. The defense plausibly argued that in discharging the shotgun defendant lacked any purpose to injure King or any awareness that King was in any danger of being injured.

An instruction that omits or misdescribes an element of a charged criminal offense violates the right to jury trial guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. Under that test, an appellate court may find the error harmless only if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*Neder v. United States* (1999) 527 U.S. 1, 7-10 [119 S.Ct. 1827, 1833-1384, 144 L.Ed.2d 35].) Applying that test here, after a thorough review of the record, I cannot say beyond a reasonable doubt that if the trial court had correctly instructed on the mental state required for an assault, the jury would have found that defendant had that mental state. Accordingly, I agree with the Court of Appeal that the instructional error requires reversal of defendant's assault conviction.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied September 26, 2001. Kennard, J., was of the opinion that the petition should be granted.