Filed 11/6/15  P. v. Garcia CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B258268 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA104905) |
| v. | |
| LEANDRO ROMERO GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Sortino, Judge.  Affirmed

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Leandro Garcia threatened his wife and then, when police arrived, he refused to leave his garage. Instead, he fired two crossbow arrows from inside the garage, piercing the closed aluminum garage door. Based on this incident, Garcia was convicted by a jury of one count of criminal threats, one count of attempted threats, and two counts of assault with a deadly weapon on a peace officer. On appeal, he challenges his conviction on the two assault counts, arguing that his conduct of firing a crossbow at a closed garage door, with unseen police officers outside, cannot amount to an assault. We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

### A. Procedural Background

In an information filed on April 17, 2014, Garcia was charged with one count of criminal threats (Pen. Code, § 422, subd. (a) (count 1));[1] one count of attempted criminal threats (§§ 644, 422, subd. (a) (count 2)); and two counts of assault with a deadly weapon upon a peace officer (§ 245, subd. (c) (counts 3 and 4)). Counts one and two were based on alleged threats Garcia made to his wife, Martha Garcia,[2] on February 27 (count 2) and February 28, 2014 (count 1). Counts three and four allege assaults by Garcia on February 28, 2014 against two police officers, Sergeant Regan (count 3) and Officer Esquivel (count 4).

At the conclusion of trial, a jury convicted Garcia on all four counts. Garcia moved for a new trial on counts three and four, which the court denied. On August 15, 2014, the trial court sentenced Garcia to a total term of five years, four months in state prison, comprised of a base term of four years (the midterm) on count three and a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Because Garcia's wife, Martha, and his son, Marcelino, share his surname, we will refer to them by their first names herein for clarity.

consecutive term of sixteen months (one-third the midterm) on count four.  The court imposed concurrent terms on counts one and two.  Garcia timely appealed.

### B.  Evidence at Trial

The prosecution's evidence at trial was largely undisputed.[3]  At the time of the incident in February 2014, Garcia and Martha had been married for 12 years and had one child, 11 year old Marcelino.  The couple was in the process of divorcing, so Martha and Marcelino were living in the couple's home in Covina, California, while Garcia had been staying in a motel.  Garcia moved into a detached garage on the family property about three to five days prior to the incident.

Both Martha and Marcelino testified that, on February 27, 2014, they returned home in the early evening to find Garcia in the house, carrying a crossbow loaded with an arrow.  Garcia held the crossbow down at his side, but seemed angry.  He then left the house.  Shortly thereafter, Marcelino told Martha that earlier in the day, Garcia had stated to Marcelino that if Martha "call[ed] the police on him," she and Garcia would die.  Martha took no action that evening regarding Garcia's actions or statement.

The following day, February 28, Garcia asked Martha for $2,000 so he could go camping.  Sometime later, Marcelino brought lunch to Garcia in the garage.  When Marcelino returned to the house, Martha testified that he seemed "nervous" and "a little scared."  Marcelino then relayed a message from Garcia that "if [Martha] didn't give [Garcia] $2,000 that [Garcia] was going to kill [Martha] or that he would find someone to kill [her]."  Martha testified that this statement made her feel "a little scared," because Garcia "was very upset" and she was afraid that he "would yell at me [] and that maybe things would get thrown and broken."  She then called the Covina police department; at trial, she claimed she made the call to seek "advice" about whether she should take Garcia's threat seriously and the police dispatcher then sent a unit in response.

---

[3] Garcia presented no evidence in his defense and did not testify at trial.

The tape of Martha's call to the police was played for the jury. In it, Martha reiterated the threat made by Garcia and told the operator he was "crazy and scary." She stated that Garcia was in the garage and told the operator to warn any officers that he had been carrying a crossbow.

After Martha called the police on February 28, 2014, Covina Police Officers Manual Esquivel and David Rodriguez responded to the Garcia residence. Martha stayed in the house but directed them toward the garage. Several witnesses testified to the details of the layout of the Garcias' garage. The main garage door was located on the east wall of the garage, fronted by the driveway. That door was an aluminum, automatic roll-up door of the type used by cars to enter the garage. The north wall of the garage contained a second, smaller, pedestrian door, as well as an unused, blacked-out window. The pedestrian door was covered by a metal screen. The prosecution also presented a diagram of the garage at trial, including measurements taken by Martha of the relative location of the doors and the arrow holes from Garcia's arrows. The closest edge of the pedestrian door was located 14.5 inches from the northeastern corner of the garage. The closest edge of the main aluminum door was 50 inches from the northeastern corner of the garage. Martha also measured 82 inches from the northeastern corner of the garage to the first arrow hole in the metal door. The second arrow hole was located further south on the main garage door—38 inches from the southeastern corner of the garage.

After arriving at the residence, the responding officers walked up the driveway, moving toward the east wall of the garage. At the time, the roll-up main garage door was closed. Officer Esquivel knocked on the pedestrian door. Officer Esquivel testified at trial that he did not stand directly in front of the door for safety reasons. Instead, he stood near the northeast corner of the garage and reached over to knock on the door. Through the closed door, Officer Esquivel identified himself as a Covina police officer and told Garcia that he needed to talk to him. Martha confirmed at trial that, from her vantage point in the house, she could hear the police identify themselves and ask Garcia to come out of the garage.

4

According to Officer Esquivel, Garcia responded "he wasn't going to come out and we were trespassing and we needed to leave." The officer again asked Garcia to step outside, but he said "no" and then said "I'm ready for you" in an angry tone. Officer Esquivel interpreted that statement as a threat, and both he and Officer Rodriguez took cover behind a tree located southeast of the main garage door, on the other side of the driveway from their previous position. The officers previously had been informed by their dispatcher that Garcia had a crossbow with him. The officers did not indicate to Garcia that they were moving away from the door. Garcia continued to curse and say that "he wasn't going to come out alive and he was ready for us."

Other police officers had arrived and were stationed behind the tree along with Officer Esquivel and behind a vehicle parked in the driveway. Officer Esquivel remained behind the tree for about three to four minutes. He then moved to a position northeast of the north corner of the garage, so he could see the pedestrian door. He remained in his northeast position until the conclusion of the standoff, approximately two and a half hours later.

About eight minutes after Officer Esquivel moved to the final, northeastern position, he heard a loud sound, which he determined was an arrow hitting the aluminum door. Officer Esquivel testified that the arrow protruded about eight to ten inches out of the door—essentially all the way to the fletching (the stabilizing fins attached to the back of an arrow). The arrow hit the door at a height of about 48.5 inches off the ground. The arrow protruded directly east. Officer Esquivel stated during cross-examination that based on the garage diagram and his testimony, the arrow hit the main door approximately 82 inches from where he had been standing while knocking on the pedestrian door. He testified that when he stated in the police report and at the preliminary hearing (without the benefit of the diagram or photographs) that the arrow was fired in the direction "I was previously at when I spoke to subject Garcia," he meant that he was in the "general vicinity" and past the eventual location of the arrow hole when approaching and retreating from the garage door.

5

Officers Frank Medina and Alex Medina subsequently arrived at the Garcia residence at about 5:20 p.m. and went to speak with Martha.  Officer Medina testified that Martha appeared "very scared" and was shaking.  Martha told the police officers that she believed Garcia wanted to die and was trying to use the police to do it.  She testified at trial that she did not think Garcia would kill her.[4]

Sergeant Daniel Regan also arrived at the scene, at about 5:20 p.m.  He saw Officers Rodriquez and Esquivel approach the garage and make the initial contact with Garcia; other officers took positions near the tree to the southeast of the garage, and Sergeant Regan drove his police car onto the driveway, about 15 to 20 feet from the street.  Sergeant Regan heard the first arrow hit the door but could not see it from his position.  Officer Rodriguez advised over the radio that an arrow had "exited the garage through the garage door towards them."  At that time, Officers Rodriguez and Esquivel were in their final position about 20 feet northeast of the garage.

At some point after the first arrow was fired, Regan began to use the PA system in his patrol vehicle to tell Garcia to come outside.  He could hear someone yelling from inside the garage, but could not clearly hear what was being said.  He then moved his vehicle closer toward the garage.  He was standing outside the driver's side of his vehicle, behind the open door.

About ten minutes after he fired the first arrow, Garcia fired a second arrow into the main garage door.  The second arrow hit further toward the south side of the garage door and again protruded about eight to ten inches out of the door, at a height of about 63 inches off the ground.  Sergeant Regan was nearby at the time, using the PA system in his vehicle to attempt to communicate with Garcia.  Sergeant Regan saw the second arrow come through the door, protruding about eight to ten inches.  He decided he was "too

_____

[4] The prosecution spent a significant amount of time at trial impeaching Martha's testimony regarding her degree of fear, in support of the criminal threats counts.  (See CALCRIM No. 1300 [criminal threat requires proof that the threat actually caused victim to "be in sustained fear for her own safety"].)  This issue is largely irrelevant to our analysis, as Garcia does not challenge his conviction on those counts.

close" so he backed his patrol car toward the street and asked for a portable PA system. When he received that system, he took it and stood behind the oak tree and continued to make announcements to Garcia from that position.

Both Regan and another officer spoke with Garcia by phone after he called the station. Regan testified that Garcia was "agitated and upset" at their presence on his property, was concerned that the police would harm him and stated he "was ready for us." Garcia also indicated he wanted the officers to shoot him. After about 30 to 45 minutes on the phone, Garcia removed the arrows from the door, exited the garage, and surrendered to police. After he was taken into custody, police officers recovered a crossbow and two arrows from inside the garage.

Garcia was interviewed at the police station about an hour later, after waiving his *Miranda* rights. He acknowledged that the crossbow was capable of killing a person, depending on where it hit them, and agreed that when he shot the arrows, someone could have been hurt. According to the interviewing officer, Garcia stated that he was going to "defend his property for his son" and that if the police had entered the garage, he would have shot them with an arrow. Garcia stated "he knew he had one good shot" and that "he had been drinking alcohol so he would not feel the gun shots" had the officers returned fire. Garcia stated that he could not see the officers when he was inside the garage, but heard them identify themselves as the police and heard them ask him to exit the garage. He initially stated that no one could have been hurt by the arrows because they did not pass completely through the garage door, but acknowledged that someone who was standing directly next to the door could have been injured.

## DISCUSSION

### A. Sufficient Evidence of Assault

Garcia first challenges the evidence supporting his assault conviction, arguing that his conduct, while reckless, did not meet the elements of assault. We conclude that there was substantial evidence from which the jury could find Garcia committed assault against Officer Esquivel (with the first arrow) and Sergeant Regan (with the second arrow).

7

*1. Legal Principles*

In determining claims of insufficient evidence, we review the entire record in the light most favorable to the prosecution "to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Silva* (2001) 25 Cal.4th 345, 368.) "We do not resolve credibility issues or evidentiary conflicts. Instead, we presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)" (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt. [Citations.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

Assault is defined by section 240 as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." This section has remained unchanged since its initial enactment in 1872, but over the decades, California courts have "struggled to fit this 1872 definition of assault into our constantly evolving framework of criminal mental states." (*People v. Williams* (2001) 26 Cal.4th 779, 784 (*Williams*).) In *People v. Rocha* (1971) 3 Cal.3d 893 (*Rocha*), the Supreme Court held that "assault with a deadly weapon is a general intent crime." (*Id*. at p. 899.) More specifically, "the criminal intent which is required for assault with a deadly weapon . . . is the general intent to wilfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another. . . . The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary." (*Ibid*., fns. omitted.)

The Court reexamined the requisite mens rea several decades later in *People v. Colantuono* (1994) 7 Cal.4th 206, 213 (*Colantuono*), explaining that "[t]he question of intent for assault is determined by the character of the defendant's willful conduct considered in conjunction with its direct and probable consequences." (*Id.* at p. 217.) As such, "the necessary mental state [for assault] is 'an intent merely to do a violent act.'

8

[Citation.] The consequences of that act serve only to inform the inquiry of whether the defendant attempted physical force against the person of another; but they are not controlling. Once the violence is commenced, 'the assault is complete.' [Citation.]" (*Colantuono*, *supra*, at p. 219.)

Finally, the Supreme Court again sought to clarify the necessary mental state in *Williams, supra*, 26 Cal.4th at p. 783. The court expressly "reaffirm[ed] that assault does not require a specific intent to injure the victim." (*Id*. at p. 788.) The court further held "a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Id*. at pp. 787-788.) The test is thus an objective one: the defendant "need not be subjectively aware of the risk that a battery might occur." (*Id*. at p. 788, fn. omitted; see also *People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1352.)

In sum, in order to sustain a conviction for assault with a deadly weapon on a police officer, the jury must find that the defendant: (1) willfully committed an act with a deadly weapon that by its nature would probably and directly result in the application of physical force to another person; (2) was aware of facts that would lead a reasonable person to realize this direct and probable consequence of his or her act; (3) had the present ability to apply force with a deadly weapon to a person; and (4) knew or should have known that the person assaulted was a police officer. (*Id*. at pp. 787-788; CALCRIM No. 860.)

Here, Garcia challenges the sufficiency of the evidence supporting the first and second elements, discussed below. In the following section, we address Garcia's challenge to the modified jury instruction regarding the third element of "present ability."

9

## 2. *Element 1: Nature of the Act*

Garcia contends that by shooting a crossbow at the closed garage door, he did not engage in an act that by its nature would probably and directly result in the application of physical force to another person. He acknowledges that use of a gun under the same circumstances would be sufficient, as it would mean that injury was "very likely to occur," but distinguishes his act of firing arrows from a crossbow, as the arrows "could not go through" the garage door. As an initial matter, the evidence does not support Garcia's suggestion that his arrows could not sufficiently penetrate the door to result in injury to a person outside of the garage. Rather, it was undisputed that both arrows pierced the door with sufficient force that they protruded eight to ten inches outside the garage. Thus, a jury could reasonably conclude that a person standing outside the garage could be hit by one of Garcia's arrows—if it passed completely through the door or if the victim was stationed close to the door—and that his act in firing the crossbow was therefore one that, by its nature, would probably result in such an application of force. (See *Williams, supra*, 26 Cal.4th at p. 787 ("assault criminalize[d] conduct based on what *might* have happened-and not what *actually* happened").)

Garcia also points out that the arrows, even if they had passed through the door completely, would likely not have hit either officer, based on their trajectory and the position of the officers at the time. But a finding of assault does not "require a specific intent to injure the victims or a substantial certainty that an application of physical force will result." (*People v. White* (2015) ___ Cal.Rptr.3d ___, 2015 WL 6468285, at *2 (*White*) (citing *Williams, supra*, 26 Cal.4th at p. 788).) Indeed, courts repeatedly have found the required intent for assault where the defendant brings a weapon "into a position where he could have used it," even if that weapon is not pointed at the victim or would not, in fact, strike the victim if used. (*People v. Raviart* (2001) 93 Cal.App.4th 258, 266 [upholding assault against two officers where defendant only pointed gun at one]; see also e.g., *People v. McMakin* (1857) 8 Cal. 547, 548 [an assault may be committed by "[h]olding up a fist in a menacing manner, drawing a sword or bayonet, [or] presenting a

10

gun at a person who is within its range"].) The crime does not require any intent to cause an application of physical force, or a substantial certainty that an application of force will result. (*Colantuono*, *supra*, 7 Cal.4th at pp. 214-220.) Here, Garcia admitted that he knew there were police officers outside the garage. He then not only raised, but fired a crossbow—an admittedly deadly weapon—toward the northern side of the main garage door, where Officer Esquivel previously had been standing to make contact with him, and then toward the southern side of the main door, near where Sergeant Regan was positioned making announcements to Garcia over the PA system. The fact that the precise trajectory of these two arrows might not have hit either officer does nothing to negate the evidence of his purposeful conduct. Accordingly, we find there was sufficient evidence to allow the jury to conclude that the first element of assault had been proven beyond a reasonable doubt.

### 3. Element 2: Knowledge

Next, Garcia argues that he lacked the requisite knowledge, because a reasonable person would assume that the arrows would be stopped by the garage door or would be unlikely to injure someone if they only passed partway through the door. We disagree.

The recent decision by our sister court in *White, supra*, 2015 WL 6468285, is instructive. There, the defendant threw a metal showerhead at a window containing wire-reinforced glass, causing the glass to shatter and resulting in injury to officers on the other side. (*Id*. at *1.) The defendant argued that a reasonable person would assume the showerhead was not likely to break a reinforced window, and, moreover, he personally did not know that the glass could be broken. (*Id*. at *2.) The court disagreed, noting that a defendant "need not be subjectively aware of the risk that a battery might occur." (*Id*. (citing *Williams, supra*, 26 Cal.4th at p. 788).) Instead, the "test is whether a reasonable person would reasonably believe that a metal object, if thrown with great force, would directly and probably injure a person on the other side of the window. [Citation.] '[A] defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find

11

that the act would directly, naturally and probably result in a battery.' [*Williams, supra*, 26 Cal.4th at p. 788, fn. 3.]" (*White, supra*, 2015 WL 6468285 at *2.)

Similarly, here, a reasonable person could conclude that firing a crossbow into an aluminum garage door, in the general direction of police officers stationed outside, would directly and probably result in the application of force to a person. There was no evidence whether Garcia believed that to be true, but his subjective belief is irrelevant to our analysis here. As noted above, Garcia does not dispute that he was aware that there were police officers outside the garage and that his crossbow could injure someone. His awareness of these facts is sufficient to establish the requisite knowledge for assault.

### B. Modified Jury Instruction

Garcia next contends that the trial court erred in giving a modified jury instruction on assault, as the instruction reduced the prosecution's burden to prove that Garcia had the present ability to apply force to a person. We find no error. The trial court properly instructed the jury on the element of present ability. Moreover, to the extent Garcia argues that there was insufficient evidence of a present ability in this case, we reject that contention as well.

### 1. Underlying Proceedings

The jury was instructed with a modified version of CALCRIM No. 860, which included the following language: "Once a defendant has attained the means and location to strike immediately, he has the present ability to apply force. The fact that the alleged intended victim takes effective steps to avoid the application of force does not negate present ability. A defendant's knowledge, or lack thereof, of such steps taken by the alleged victim are not relevant to the issue of present ability to apply force, if the defendant has the ability to carry out the method of assault chosen."

At trial, defense counsel objected to the first sentence of the proposed instruction based on the uncontroverted evidence that Garcia never left the garage, so there was no evidence that he obtained a location from which to strike immediately, and therefore no basis for the instruction. The court overruled the objection. Garcia's counsel also

12

requested a clarification to state that the modified portion of the instruction related to the issue of present ability, which the court granted.

### 2. *No Error in Instruction on Present Ability*

Garcia claims the modified instruction was "incorrect, misleading, confusing and ambiguous," and "presumed present ability," thereby lessening the prosecution's burden of proof. The instruction was based on language from a line of cases considering whether the present ability element is met where external circumstances, including acts by the victim, were successful in avoiding injury. In *People v. Valdez* (1985) 175 Cal.App.3d 103, 106-107, for example, the defendant fired several gunshots at a gas station cashier, but the cashier was behind bulletproof glass and was therefore unharmed. In concluding that the defendant had the present ability to inflict injury, the court noted that the real function of the "present ability" element in assault "is to require the perpetrator to have gone beyond the minimal steps involved in an attempt." (*Id*. at p. 112.) Thus, "to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim." (*Ibid*.) Moreover, subsequent effective steps taken by a victim to avoid injury do not negate this present ability. (*Ibid*.; see also *People v. Kong* (1892) 95 Cal. 666, 670 [defendant who fired through roof at officer but was mistaken as to officer's exact location had the present ability to inflict injury]; *People v. Craig* (1991) 227 Cal.App.3d 644, [defendant who cut victim's brakes had present ability to injure, even though it was unlikely that victim would fail to detect the attack].)[5]

The Supreme Court further clarified the present ability requirement in *People v. Chance* (2008) 44 Cal.4th 1164. During a police pursuit, the defendant hid behind a trailer and pointed his gun in the direction he thought the officer would appear. (*Id*. at p. 1168.) Instead, the officer approached the defendant from behind. (*Ibid*.) The defendant

---

[5] By contrast, a defendant lacks the present ability to inflict injury where he does not obtain such means, such as where he or she points an unloaded, or a toy, gun at someone. (See *Valdez, supra*, 175 Cal.App.3d at p. 111 (collecting cases).)

argued he lacked the present ability to commit an assault, as he never pointed his weapon in the officer's direction. (*Id*. at 1176.) The court disagreed, citing *Valdez*, among others, holding that the defendant "attained the present ability to inflict injury by positioning himself to strike on the present occasion with a loaded weapon." (*Ibid*.) Further, "[t]here is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (*Id*. at p. 1172.)

We conclude that the language of the modified jury instruction was consistent with the case law above. In essence, Garcia argues that he could not have completed an assault from the garage (for all the reasons outlined above) and therefore it was impossible for him to obtain a location from which to strike and improper for the court to instruct otherwise. We disagree, as we have herein.

Garcia also suggests that the instruction as worded could apply to "any person who has a deadly weapon in their residence," and therefore left the jury with no choice but to find present ability. This argument ignores the requirement, as reflected in the instruction given, that the defendant must have attained the means and location "*to strike immediately*"—that language appropriately reflects the steps defendant must have taken in order to have the present ability to apply force. (See *Valdez, supra*, 175 Cal.App.3d at p. 112.) We also note that Garcia did not challenge the proposed instruction (or request modification or clarification) on this basis below, and his argument is therefore forfeited. (See *Craig, supra*, 227 Cal.App.3d at p. 650 ["Appellant did not request clarifying instructions and has waived any claim that the instruction was incomplete or needed amplification in light of the facts of this case."].)

In addition, to the extent Garcia's argument can be read as an attack on the sufficiency of the evidence of his present ability, we reject that contention as well.[6] Garcia equipped himself with a deadly weapon, concealed himself in the garage, and

---

[6] Of course, Garcia's counsel was free to (and did) argue to the jury that Garcia did not have the present ability to strike based on the evidence.

14

then, after police officers approached, fired arrows partially through the door. In other words, he "attained the present ability to inflict injury by positioning himself to strike on the present occasion with a loaded weapon." (*Chance, supra*, 44 Cal.4th at p. 1175.) The evidence was sufficient to establish his present ability to strike. That the officers took steps to avoid injury by moving away from the doors and seeking cover does not negate that ability.

### C. Attack on Prevailing Law

Finally, Garcia urges us to adopt the "better view" and "declare assault to be a specific intent crime," in line with dissenting opinions in *Colantuono, supra*, 7 Cal.4th at p. 224 and its progeny. Our Supreme Court has repeatedly and expressly rejected this invitation, instead reaffirming the decades of case law holding that assault is a crime of general intent. (See, e.g., *Rocha, supra*, 3 Cal.3d at p. 899; *Colantuono, supra,* 7 Cal.4th at p. 218; *Williams, supra*, 26 Cal.4th at p. 784.) We are bound by this precedent. (See, e.g., *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.


15