Filed 3/19/13  P. v. Locke CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TYRIK LOCKE,<br><br>Defendant and Appellant. | F063520<br><br>(Madera Super. Ct. No.<br>MCR033665)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne LeMon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant Tyrik Locke (defendant) was charged with count I, battery causing great bodily injury (Pen. Code,[1] § 243, subd. (d)), and count II, criminal threats

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

(§ 422), based on an incident where defendant punched and threatened Monica Galvan. After a jury trial, defendant was convicted as charged in count I and, as to count II, he was convicted of the lesser included offense of attempting to make a criminal threat (§§ 664/422). He was sentenced to three years in prison.

On appeal, defendant contends his conviction for attempted criminal threats must be reversed because the jury was not properly instructed on the elements of the offense. He also contends the court should have granted his motion to instruct the jury about accident as a defense to battery. We will affirm.

## FACTS

Defendant Tyrik "Ti" Locke, Monica Galvan, Robert "Bobby" Morales, and "Rick" Alvarez had known each other for many years. Galvan was not dating defendant or the others.

On the evening of June 23, 2008, Galvan joined defendant, Morales, and Alvarez for an evening at Chukchansi Casino to celebrate their recent birthdays. Morales drove the group from Fresno to the casino in his two-door Honda Accord coupe. They spent several hours socializing and drinking, and everyone got along with one another. They had smoked marijuana earlier in the evening.

After several hours, Galvan and the three men left the casino. As they walked to Morales's car, defendant and Galvan were "kind of flirting a little bit." The flirting stopped when defendant approached and talked to another woman. Defendant then joined the others in Morales's car. Morales was the driver, and defendant sat in the front passenger seat. Galvan sat behind the driver, and Alvarez was behind defendant.

As Morales drove back to Fresno, Galvan asked defendant about the woman. Galvan described it as "friendly banter" and "not anything aggressive." Galvan and defendant were exchanging "friendly insults" with each other.

As the drive continued, however, Galvan testified that defendant became upset and "proceeded to get a little irate" at her. Defendant turned around to look over his shoulder

2.

at Galvan. He became "[p]rogressively" angry, started yelling, and then went "on a rampage."

Galvan tried to calm defendant, and explained that she did not mean to offend him. However, defendant became more upset and continued his verbal rant. Defendant turned around in the front seat so that he faced her in the backseat. Defendant said "very, very ugly, ugly" and hurtful things to her. Galvan thought defendant was intoxicated because he did not seem like himself. Galvan testified that neither Morales nor Alvarez intervened.

Galvan testified that defendant yelled at her for about 20 to 25 minutes. Defendant turned around and was about halfway into the backseat. Galvan looked down and tried to ignore him. Galvan testified that defendant suddenly punched her in the mouth and nose. Galvan did not see the punch coming since she was looking down. "My nose was split all the way up and my teeth were broken," and her two front teeth fell into her hand. Galvan looked up and saw defendant kneeling on the front seat, facing her, and he was "trying to get to me again."

Galvan was crying and screaming at defendant, " 'Look at – look what you did.' " Alvarez, who was sitting next to Galvan in the back seat, got completely on top of Galvan to protect her from defendant. Alvarez grabbed defendant's left arm, and used his weight to push Galvan down to the floor. Galvan believed Alvarez saved her life. Morales, the driver, grabbed defendant's right arm, and kept driving as he held onto defendant.

Galvan testified that it took another 8 to 10 minutes to get to Fresno. During that time, defendant repeatedly said: " 'I'm going to kill this bitch.' " Galvan was afraid because defendant "was really trying to kill me and I thought he was."

Galvan testified that when they arrived in Fresno, Morales pulled into the shopping center where Alvarez had parked his car earlier in the evening. Morales opened his driver's door while the car was still rolling. Morales and Alvarez pulled Galvan out

3.

of the backseat without moving the driver's seat forward. Alvarez held Galvan, took her to his car, and drove her home. Galvan called the police as soon as she got home.

**Initial investigation**

On June 24, 2008, Officer Glenn Turk responded to Galvan's residence and interviewed her about the assault. Galvan was "still upset from being assaulted." There was dried blood on her nose, and she had at least two chipped teeth. Turk testified her facial injuries were consistent with being punched.

Officer Turk testified that Morales arrived at Galvan's residence during the interview. Turk separately interviewed Morales, who was quite a bit calmer than Galvan. Morales said that defendant had been very drunk that night. Morales said that Galvan and defendant argued because she thought defendant "could do better" than the women who he was dating, and defendant kept calling Galvan a "bitch." Morales said that defendant threatened Galvan. Galvan kept asking defendant why he was "disrespecting her." Morales saw defendant punch Galvan once in the face with his fist. Morales and Alvarez held back defendant because he was trying to hit her again. Morales said they held down defendant until he finally stopped resisting.

On June 30, 2008, Sergeant Jason Clark interviewed Morales, who said that defendant and Galvan argued in the car; defendant turned around in the front seat and faced Galvan in the back seat; Morales knew something happened based on things that defendant and Galvan said. Alvarez tried to shield Galvan, and Morales grabbed defendant's arm to hold him back. Defendant continued to yell at Galvan, and he repeatedly told her to shut up. During this second interview, Morales did not say anything about defendant making threats to Galvan.

**Additional prosecution evidence**

Galvan testified she went to the emergency room for her facial injuries, and she subsequently needed multiple dental treatments to deal with her broken and chipped

teeth. She also suffered a gash on her nose, with the skin split open "quite deeply" from the bottom of the inner nostril almost to her sinuses.

Galvan testified that a couple of days after the assault, Alvarez told her that defendant was getting scared. Alvarez advised Galvan that defendant offered to pay for the damage to Galvan's teeth. Galvan testified that she replied no, that she had "just spent $10,000 on my teeth six months prior [for unrelated dental work] and hell no, not even for $100,000 I would ever …." Galvan denied that she made a statement that "this could go away" for $10,000.

Galvan testified that when she was interviewed by the police, she gave them Alvarez's contact information. After the police interviewed Alvarez, he called her and he "cursed me out to the highest" for "sending the cops to his house." Galvan testified that she was no longer friends with Morales or Alvarez because they remained friends with defendant, and she felt betrayed.

## Morales's trial testimony

Morales testified as a prosecution witness that defendant was still his friend, and he did not want to testify. Morales claimed that he could not recall making any prior statements about the incident, or saying that defendant punched Galvan in the face. Instead, Morales testified that defendant and Galvan had a friendly disagreement during the drive back to Fresno. He did not get involved because it was personal between them. Morales testified that at some point, Galvan's attitude changed, she became "more violent" towards defendant, and they were "verbally aggressive towards each other." Morales testified that defendant did not sit up on his seat. Morales knew something happened but did not see it, and he never saw any blood. Morales could not recall holding defendant's arm or restraining him.

Morales testified that defendant never threatened to kill Galvan. Morales further testified that on a later occasion, he was at Galvan's apartment and heard her say: " 'For $10,000, this can go away.' "

## DEFENSE EVIDENCE

### Testimony of Alvarez

Alvarez testified as a defense witness and said that he did not want to appear at trial. Alvarez testified that during the drive from the casino, everyone was joking and insulting each other. Galvan criticized "the genre of girls [defendant] liked," and things became a little tense between them. Defendant responded about "the genre of guys she liked," and Galvan did not like that. Defendant might have called her a "bitch," and Galvan used a racial expletive toward him. Alvarez never saw defendant get out of his seat or try to get into the back seat. He thought defendant was rolling a marijuana joint on his lap. He never saw defendant punch Galvan. However, something happened and her teeth came out.

Alvarez denied that he had to protect Galvan from defendant. Alvarez said he never got on top of her, and he never saw any blood. Defendant and Galvan exchanged more words. Galvan was upset and things remained tense. When they arrived in Fresno, Alvarez drove Galvan back to her house and tried to calm her down. Galvan was upset because of how her teeth looked.

Alvarez admitted that after the police interviewed him, he called Galvan and complained that she gave his name to the officers. He never cursed or yelled at her. He knew Galvan was angry at him, but he did not know why.

### Defendant's trial testimony

Defendant testified that he did not drink any alcohol when he was at the casino, and he could not recall anyone else drinking. However, he gave some money to Galvan so she could buy drinks. During the ride back to Fresno, he moved his front seat forward to give Alvarez more room in the backseat. Defendant wore his seatbelt during the trip.

Defendant testified that they talked and joked during the drive. Galvan made jokes about the type of women who defendant was dating, and she used a racial expletive but not in a derogatory manner. However, he revealed a secret that had been between

6.

defendant and Galvan, and Galvan became upset.  Galvan told defendant not to say that anymore.  She yelled at him not to call her a "bitch," and threatened to slap him if he did so again.

Defendant testified that he was being "childish" and "just egged her on."  Galvan screamed at him.  He felt Galvan get out of her seat and come up from behind him.  He saw a sudden movement from his peripheral vision, and thought she was going to slap him.  He "threw up" his elbow as "more of a flinch" or reaction as opposed to trying to hit someone.  "I felt she was going to slap me, so I just put my elbow up to protect my face."  Defendant said he was "absolutely not" trying to hit her in the face.[2]

Defendant testified he looked into the backseat and saw defendant holding her mouth.  The car became quiet because they were concerned about Galvan's "well-being at that point," although they did not take her for any medical treatment.  Defendant testified he did not get out of his seat or threaten Galvan.  Defendant testified that when they arrived in Fresno, Galvan did not climb out of the backseat while the car was still rolling.

Defendant testified he was still friends with Morales and Alvarez, but he no longer had any contact with Galvan.  It was stipulated that defendant was convicted of a misdemeanor crime of moral turpitude in February 2000.

## DISCUSSION

### I. Instructions on attempted criminal threat

Defendant was charged in count II with criminal threat, based on his statements to Galvan in the car.  The jury was instructed that attempted criminal threat was a lesser included offense of count II.  Defendant was found not guilty of a criminal threat but convicted of the lesser included offense of an attempted criminal threat.

---

[2] In section II, *post,* we will fully address defendant's trial testimony about what happened in the car, and whether the court should have instructed on accident as a defense to count I, battery causing serious bodily injury.

On appeal, defendant contends his due process rights were violated, and his conviction for attempted criminal threat must be reversed, because the court failed to fully instruct the jury on the elements of the lesser included offense – particularly whether the defendant's intended threat "reasonably could have caused [the victim] to suffer sustained fear."

## A. Criminal threats

We begin with the statutory definitions of the relevant offenses. In order to prove the offense of criminal threat in violation of section 422, the prosecution has the burden of proving five elements:

> "(1) [T]hat the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat – which may be 'made verbally, in writing, or by means of an electronic communication device' – was 'on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*); *In re George T.* (2004) 33 Cal.4th 620, 630.)

Section 422 is not unconstitutionally overbroad because it is narrowly tailored to true threats, which are not protected by the First Amendment. (*Toledo*, *supra*, 26 Cal.4th at p. 233.)

## B. Attempted criminal threat

The California Supreme Court has held that "there is a crime of attempted criminal threat in this state, defined through the interplay of section 422 and the statutory provisions relating to attempts," i.e., sections 21a and 664. (*Toledo*, *supra*, 26 Cal.4th at p. 230.) Section 664, which defines attempt, "provides that '[e]very person who attempts to commit *any* crime' (italics added) is subject to the criminal punishment set forth in that

8.

provision, and this language on its face thus includes those who attempt to commit the crime of criminal threat set forth in section 422." (*Id*. at p. 230.)

> "[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, *under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear* for his or her own safety or for his or her family's safety." (*Id*. at pp. 230-231, italics added.)

*Toledo* further held that the offense of attempted criminal threat was not unconstitutionally overbroad, and explained that such an argument "misconceives the general circumstances to which the crime of attempted criminal threat ordinarily will apply." (*Toledo*, *supra*, 26 Cal.4th at p. 233.)

*Toledo* noted that there were a "variety of potential circumstances" which fell within the offense of attempted criminal threat, and provided three examples "of some of the most common situations that would support a conviction of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at pp. 231, 234.) First, "if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat *by means of a written threat*, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat." (*Id*. at p. 231, italics added.)

Second, "if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason *the threatened person does not understand the threat*, an attempted criminal threat also would occur." (*Toledo*, *supra*, 26 Cal.4th at p. 231, italics added.)

9.

Third, "if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at p. 231, italics in original.)

*Toledo* explained that in these situations, "only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Toledo*, *supra*, 26 Cal.4th at p. 231.)

> "[I]n most instances the crime of attempted criminal threat will involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation (for example, because the threat is intercepted or not understood, *or because the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances*). In each of these situations, a defendant who is convicted of attempted criminal threat will be held criminally responsible only for speech that clearly is not constitutionally protected, and thus it is evident that in these instances a conviction of attempted criminal threat will pose no constitutional problems." (*Id*. at p. 234, first italics in original, second italics added.)

With these standards in mind, we turn to the instructions given in this case and defendant's claim of error.

## C. Instructions

In the instant case, defendant was charged in count II with the crime of criminal threat in violation of section 422. The jury was instructed that count II, criminal threat, and attempted criminal threat as a lesser included offense, required a specific intent or mental state, that the person "must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent

10.

and/or mental state required are explained in the instructions for that crime." (CALCRIM No. 252.)

As to count II, the jury was instructed with CALCRIM No. 1300, that the prosecution had the burden of proving the following elements of violating section 422, criminal threat:

> "[O]ne, the defendant willfully threatened to kill or unlawfully cause great bodily injury to Monica Galvan; the defendant made the threat orally; the defendant intended that his statement be understood as a threat; and intended that it be communicated to Monica Galvan; the threat was so clear, immediate, unconditional, and specific, that it communicated to Monica Galvan a serious intention and the immediate prospect that the threat would be carried out; the threat actually caused Monica Galvan to be in sustained fear for her own safety; and Monica Galvan's fear was reasonable under the circumstances.
>
> "Someone commits an act willfully when he or she does it willingly or on purpose. In deciding whether a threat was sufficiently clear, immediate, unconditional and specific, consider the words themselves as well as the surrounding circumstances. Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act. [¶] … [¶]
>
> "Sustained fear means fear for a period of time that is more than momentary, pleading or transitory. An immediate ability to carry out the threat is not required."

The jury was also instructed with CALCRIM No. 460, that attempted criminal threat was a lesser included offense of count II, and that the prosecution had the burden of proving the following elements:

> "To prove that the defendant is guilty of this crime, the People must prove that *one, the defendant took a direct but ineffective step towards committing criminal threats; and, two, the defendant intended to commit criminal threats*. A direct step requires more than mere planning or preparing to commit the criminal threats or obtaining or arranging for something needed to commit criminal threats. A direct step is one that goes beyond planning and preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit criminal threats. It is a direct movement towards the commission of the crime after preparations are made. It is an immediate

11.

step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not undirected the attempt.

"The person who attempts to commit criminal threats is guilty of attempted criminal threats even if after taking a direct step towards committing the crime, he or she abandoned further efforts to complete the crime or if his or her attempt failed or was interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step towards committing criminal threats, then that person is not guilty of attempted criminal threats. *To decide whether the defendant intended to commit the criminal threats, please refer to the separate instruction [on criminal threats]*." (Italics added.)

**D. The jury's question about count II**

During deliberations, the jury asked the following question:

"[W]e request a clarification of what Penal Code 664 differs from [section] 422 in writing."

The court stated that the jury had attached CALCRIM No. 1300, the definition of criminal threats, to the question.

The court interpreted the jury's question as meaning that it wanted to know "the difference between Count 2 and the lesser included of Count 2, the attempted 422. They do have a jury instruction they have my copy…." The court decided to answer the jury's question by again providing it with CALCRIM No. 460, and explaining that it was the instruction that defined attempted criminal threats. Neither the district attorney nor defense counsel objected.

The court gave the following written response to the jury, and attached CALCRIM No. 460 to the written response:

"Attached to this is jury instruction number 460, which describes the crime of [sections] 664/422, attempted criminal threats."

The jury found defendant not guilty of count II, criminal threats, but guilty of attempted criminal threats as a lesser included offense.

12.

## E. *Jackson*

Defendant contends the jury instructions in this case were erroneous based on *People v. Jackson* (2009) 178 Cal.App.4th 590 (*Jackson*), which interpreted *Toledo, supra*, 26 Cal.4th 221 and attempt, and that the jury in this case should have been instructed that any fear felt by the victim was reasonable in order to convict defendant of attempt.

In *Jackson*, the landlords asked the defendant to leave the apartment where he had been staying. He refused and threatened to get a rifle and " 'blow' " the " 'heads off' " of the two landlords. (*Jackson*, *supra*, 178 Cal.App.4th at p. 594.) The defendant was charged with two counts of criminal threats. The jury was instructed that attempted criminal threats were lesser included offenses and received the pattern instructions for attempt and the substantive offense. (*Id.* at pp. 593, 598-599.) The defendant was not convicted of the charged offenses but was convicted of two counts of attempt as lesser included offenses. (*Id.* at p. 593.)

*Jackson* addressed the defendant's appellate arguments that the trial court erred by failing to instruct the jury sua sponte that, "in order to find him guilty of attempted criminal threat, it must find that 'it would have been reasonable for a person to have suffered sustained fear as a result of the threat under the circumstances of this case.' " (*Jackson*, *supra*, 178 Cal.App.4th at p. 595.) The People responded that when a defendant has done everything he needs to do to complete the crime of criminal threat, but did not achieve his intended result, he has committed an attempted criminal threat regardless of whether the intended threat reasonably could have caused the target to suffer sustained fear. (*Id.* at pp. 595-596.)

*Jackson* rejected the People's argument "because the Supreme Court's definition of the crime of attempted criminal threat expressly includes a reasonableness element," based on its interpretation of *Toledo*. (*Jackson*, *supra*, 178 Cal.App.4th at p. 596.) *Jackson* held that the jury instructions were erroneous because the reasonableness

13.

element was included *only* in the instruction which defined the substantive offense, and not in the separate instruction on attempt. (*Id.* at pp. 599-600.) Thus, the "jury was not instructed to consider whether the intended threat reasonably could have caused sustained fear under the circumstances." (*Id.* at p. 599.) "By insisting that the intended threat be evaluated from the point of view of a reasonable person under the circumstances of the case, we can insure that punishment will apply only to speech that clearly falls outside First Amendment protection." (*Id.* at p. 598.)

*Jackson* held the instructional error was prejudicial because the jury must have found that the defendant made threats and intended them to be taken as threats, but also found "that one or both of the last two elements of the completed crime was missing,…" (*Jackson, supra,* 178 Cal.App.4th at p. 600.) Jackson noted that the evidence would have supported findings that one or both elements were missing. (*Ibid.*) Thus, the jury could have concluded that the victims did not suffer sustained fear, i.e., the jury might not have believed the victims' testimony that they feared for their lives. Such a scenario would have supported a conviction of attempted criminal threats only upon a finding that a reasonable person could have suffered fear in those circumstances, something the jury was not asked to decide. (*Id.* at p. 600.) Alternatively, the jury could have concluded that the victims' fear was unreasonable under the circumstances, i.e., the victims were safely inside the house with a telephone to call the police while the defendant sat out front. This alternate scenario would have been legally insufficient to support an attempted criminal threat conviction. (*Ibid.*)

*Jackson* thus expanded on *Toledo* by affirmatively requiring the trial court to instruct the jury that, on a charge of attempted criminal threat, it must decide whether the "intended threat reasonably could have caused sustained fear under the circumstances." (*Jackson*, *supra*, 178 Cal.App.4th at p. 599.) *Jackson* reversed the defendant's conviction because such an instruction was not given, and the jury could have concluded that

14.

defendant's statements could not have reasonably caused the victims to suffer sustained fear. (*Id.* at p. 600.)

### F. Analysis

Defendant contends that the court erroneously instructed the jury with the pattern instructions of CALCRIM Nos. 1300 and 460, as to the elements of attempted criminal threat. Defendant argues that *Jackson* required the court to separately instruct the jury that to convict him of attempt, it had to find that it would have been reasonable for a person to have suffered sustained fear as a result of the threat under the circumstances of the case. Defendant further argues the claimed error is prejudicial because the jury in this case could have reached the same conflicting conclusions as the jury in *Jackson*.

*Jackson* is distinguishable from the instant case. *Jackson* noted that the jury in that case may have found the defendant's statements – that he was going to blow off the landlords' heads – did not reasonably cause the victims fear under the circumstances because they were "safely inside the house with a telephone to call the police while defendant sat out front," and further characterized defendant's statements as "outlandish." (*Jackson*, *supra*, 178 Cal.App.4th at p. 600.) In contrast, defendant's statements in the instant case – that he was going to kill Galvan – were made in the close confines of a compact car, immediately after he had turned around in the front seat and punched Galvan as she sat in the back seat. Unlike the victims in *Jackson*, Galvan was not in a place of safety or able to call for help, and she was completely at the mercy of Morales and Alvarez, who apparently protected her until they reached Fresno. Given defendant's violent physical and verbal behavior, and the injuries sustained by Galvan, it could only have been reasonable for a person in Galvan's situation to feel fear at the time that defendant made the statements. In light of the evidence, defendant's conviction for attempt cannot be attributed to the omission of a specific jury instruction requiring the jury to find the victim's fear was reasonable, and any error would be harmless. (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.)

We thus conclude that to the extent the jury instructions may have been incorrect, any error is necessarily harmless under any standard given the nature and circumstances of the threat in this case.**3**

## II. Instructions on accident

Defendant next contends the court should have granted his motion to instruct the jury on accident as a defense to count I, battery causing serious bodily injury. Defendant contends his trial testimony supported the instructional request because he testified that he "flinched" in reaction to Galvan's movements in the backseat, thus negating his intent.

### A. Defendant's trial testimony

As set forth *ante*, defendant testified at trial to a vastly different version of events from Galvan's description of what happened in the car. Defendant testified that Galvan was screaming at him because he had revealed a secret that had been between them. Defendant felt Galvan "was coming up behind me because she was upset about the comment I made, she said that if I said the bitch word again, that she would slap me." Defendant testified that he "just egged her on" and he was "being childish."

> "Q    And then what?
>
> "A    I – as I proceeded to egg her on, *I felt a sudden movement and I just threw my elbow up* and –
>
> "Q    Okay.
>
> "A    And I looked back and she was holding her mouth.
>
> "Q    You say you felt a sudden movement. Was it kind of moving in the air or was it a sight through your peripheral vision?

---

**3** We note that the California Supreme Court recently granted a petition for review in *People v. Chandler* (review granted Feb. 13, 2013, S207542). *Chandler* strongly criticized and disagreed with *Jackson*'s holding about the instructions required for attempting to make criminal threats.

16.

"A     It was a little bit of both.  Like I said, it's – I already felt her out of her seat.  Besides her, you know, her – her voice escalated.  You can tell when somebody's right behind you or if they're further away.

"Q     Okay.  [¶]  Now, you say you threw your elbow out, were you trying to hit somebody or was it just a flinch?

"A     *It was more of a flinch because I thought that she was going to slap me because I called her a bitch one last time.  And I didn't just call her a bitch, I – I used it in an egg-ish kind of fashion.  I said 'bitch' and I felt that she was going to slap me, so I just put my elbow up to protect my face.*

"Q     Was that a conscious decision that, okay, you're going to stick your elbow in somebody's face, or was it more of just a flinch?

"A     Just a flinch.

"Q     Were you trying to hit her in the mouth?

"A     Oh, absolutely not."  (Italics added.)

On cross-examination, defendant testified that Galvan said she was "going to slap me" just before he felt "the sudden movement" behind him.  Defendant felt Galvan's "presence lunging forward," but he never felt slapped.

"Q     Now, you stated that you threw your elbow up and you stated that was to block?

"A     It was a reaction, a flinch."

Defendant testified that he tried to protect the side of his face from Galvan.

## B.  **The instructions**

During the instructional phase, the court asked the parties whether it should give CALCRIM No. 3404 on "accident."  The court read the proposed instruction:

> " 'The defendant is not guilty of the crimes charged in the Information or any lesser included offenses if he acted without the intent required for that crime but acted instead accidentally.  You may … not find the defendant guilty of the crimes unless you are convinced beyond a reasonable doubt that he acted with the required intent.' "

The prosecutor objected to CALCRIM No. 3404 because defendant testified he was "moving to block himself from being hit. It was not an accidental movement." Defense counsel said that it was "unclear exactly … what was going on, but I think there was an element of defending self from this person suddenly showing up and there was also an element of accident. He didn't mean to actually make contact with her." Defense counsel believed the court should instruct on both accident and self-defense.

The court replied that defendant said he "raised his arm to protect himself. It sounds like self-defense. It doesn't sound like an accident. It's not like he was leaning over to tie his shoe and bumped somebody's head. This is where he put his arm in that location so that anybody coming forward would be hit or would be blocked. It does not appear to sound like an accident to me."

Defense counsel argued that defendant said "it was a flinch," and "a reasonable jury could find either way." The court replied that defendant testified "the purpose of that flinch, it wasn't an action that just occurred without thinking. He put his hand there in order to block … any blows that might come towards him. I mean, to me, it sounded intentional is what he was saying." Defense counsel again argued that defendant said he moved without thinking. The prosecutor replied that it might have been a reflex motion, but defendant was trying to cover his face and he never admitted being in contact with the victim.

The court decided to instruct the jury on self-defense, but held that the accident instruction was not supported by the evidence.

### C. Analysis

Defendant contends the court committed reversible error by failing to grant his motion to instruct the jury about accident pursuant to CALCRIM No. 3404. A court does not have a sua sponte duty to instruct on an accident defense, but it must give a pinpoint instruction on the defense when it is requested and supported by the evidence. (*People v. Anderson* (2011) 51 Cal.4th 989, 996-998 (*Anderson*).) "In determining whether the

evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt ....' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) Given defendant's instructional request in this case, we must thus determine whether there was substantial evidence to support CALCRIM No. 3404, and the court should have given the instruction as a defense to the charged offense of battery.

The crime of assault requires that the defendant commit an act that by its nature will probably result in the application of wrongful physical force on another, and the crime of battery requires that the defendant actually apply this force on another. (*People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*); *People v. Marshall* (1997) 15 Cal.4th 1, 38; *People v. Colantuono* (1994) 7 Cal.4th 206, 214 & fn. 4, 216 (*Colantuono*).) Assault and battery are general intent crimes, requiring that the defendant commit the proscribed act willfully, i.e., on purpose. (*Williams, supra,* 26 Cal.4th at pp. 782, 785; *Colantuono, supra,* 7 Cal.4th at pp. 213-214; *People v. Lara* (1996) 44 Cal.App.4th 102, 107 (*Lara*).) Further, the defendant must have had knowledge of facts that would lead a reasonable person to realize the application of force was likely to result from the act. (*Williams*, *supra*, 26 Cal.4th at p. 788.)

Section 26 provides: "All persons are capable of committing crimes except those belonging to the following classes: [¶] ... [¶] Five – Persons who committed the act or made the omission charged *through misfortune or by accident,* when it appears that there was no evil design, intention, or culpable negligence." (Italics added.) "The accident defense amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime. [Citations.]" (*Lara*, *supra*, 44 Cal.App.4th at p. 110.) "The defense appears in CALCRIM No. 3404, which explains a defendant is not guilty of a charged crime if he or she acted 'without the intent required for that crime, but acted instead accidentally.' " (*Anderson*, *supra*, 51 Cal.4th at p. 996.)

The defense of accident may be raised to rebut the mental element of the charged offense. (*Anderson*, *supra*, 51 Cal.4th at p. 998.) Thus, an accident defense can apply to charges of assault or battery when the defendant unwillingly or unknowingly (i.e., accidentally) directed force towards, or touched, the victim. (*Lara*, *supra*, 44 Cal.App.4th at p. 106; *People v. Gonzales* (1999) 74 Cal.App.4th 382, 385, 390, disapproved on other grounds in *Anderson*, *supra*, 51 Cal.4th at p. 998, fn. 3 [accident instruction supported by evidence showing defendant accidentally struck victim with door when he entered room as victim was leaving].)

As applied to the instant case, defendant tried to characterize the movement of his arm as an alleged "flinch," but he repeatedly admitted that he raised his arm to protect himself from what he believed was Galvan's attempt to slap him in response to his repeated and "childish" name-calling. Even under defendant's version of the incident, there are no facts showing his movement towards the victim was accidental or without knowledge of the relevant facts. Instead, defendant moved his arm out of his own volition to protect himself based on his belief that Galvan was moving forward to slap him.

Defendant's trial testimony did not support the accident instruction, but the court properly instructed the jury with CALCRIM No. 3470 on self-defense, as follows:

> "The defendant acted in lawful self-[defense] if, one, the defendant reasonably believed that he was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against the danger; and, three, the defendant used no more force than was reasonably necessary to defend … against that danger.
>
> "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself. Defendant's belief must have been reasonable and he must have acted because of that belief.
>
> "The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the

20.

defendant used more force than was reasonable, the defendant did not act in lawful self-defense.

"When deciding whether the defendant's belief was reasonable, consider all of the circumstances as they were known to you and appeared to the defendant and consider … what a reasonable person in a similar situation with similar knowledge would have believed.

"If the defendant's belief were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat.  He is or she is entitled to stand his or her ground and defend himself and if reasonably necessary to pursue an assailant until the danger of unlawful touching has passed.

"This is so even if safety could have been achieved by [retreating].

"The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense.…"

## DISPOSITION

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Kane, J.

21.