Filed 3/29/16  In re A.B. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | G051283 |
| Plaintiff and Respondent, | (Super. Ct. No. DL050069) |
| v. | O P I N I O N |
| A.B., | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Julian W. Bailey, Judge.  Reversed and remanded.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Seth Friedman, Heidi Salerno and Samantha Begovich, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

The juvenile court adjudicated 17-year-old A.B. a ward of the court (Welf. & Inst. Code, § 602) based on its findings he committed aggravated assault (Pen. Code, § 245, subd. (a)(1); all further statutory references are to this code), and misdemeanor assault (§ 240), battery (§ 242), and brandishing a knife (§ 417, subd. (a)(1)). After striking the misdemeanor assault count, the court set a "maximum term" of confinement for A.B. though it did not place him in custody, and instead required probation with 120 days of house arrest.

A.B. challenges the sufficiency of the evidence to support the finding he committed aggravated assault when he cut his mother's arm with an unfolded knife as she stepped with outstretched arms between A.B. and her boyfriend. A.B. and the boyfriend argued while several feet apart on a stairway, but the record does not bear out the prosecutor's assertion A.B. was "waving a knife around." The juvenile court based its assault finding on evidence A.B. brandished the knife. But as we explain, brandishing is not equivalent to an assault because it does not necessarily involve waving, gesturing, or striking with a knife, or otherwise using a weapon in a manner likely to result in a battery as a natural and probable consequence. Instead, brandishing may be accomplished merely by exhibiting the weapon (§ 417, subd. (a)(1)), and there was no evidence A.B. did anything more here. The only testifying eyewitness stated that A.B. did not gesture in any manner with the knife; indeed, she did not even see it. On this record, we must reverse the judgment and remand for a new wardship hearing.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.B. and his mother's boyfriend, Amin, lived together in mother's home for three years before the incident in October 2014. Around 9:00 a.m., A.B. slammed the front door and Amin came downstairs to ask what happened. Mother explained that A.B. was "in a bad mood," and the couple went upstairs to discuss A.B.'s behavior behind closed doors in the master bedroom. A.B., however, barged into the room shouting and

2

upset that they "were talking about him," just as Amin complained that A.B. was "being irritating."According to mother, A.B. was not angry and did not argue with her, but only Amin.

When A.B. continued yelling, Amin departed the room, A.B. returned briefly to his own room and then continued "calling [Amin] names" as Amin descended the stairs. As Amin proceeded down, he stopped and commented to A.B. in Farsi that "whatever you're saying reflects [on] you." Meanwhile, mother also had moved onto or near the stairs, "just like on the tip of the first step going down." A.B. was above her"up the stairs,"but still on the second floor and "still cussing away" at Amin, who stoodbelow her near the middle of the stairs. Mother described the stairway as "normal-size," about 20 feet long, and she stood closer to A.B. than to Amin. She estimated variously that A.B. was about five feet away from her or "[t]he extent of my hand reaching out."

As mother looked down the stairs at Amin, she told him "we should leave or you should stop talking, you know, don't shout at each other." She lifted both her arms, her right arm up and extended out towards A.B. and her left arm similarly up and out towards Amin, and as she did so, she felt a sharp cut on her right hand "about halfway up from the base of the palm toward the little finger."

She had not seen anything in A.B.'s hand. She had not been trying to touch him, but rather her "arm movements essentially were part of [her] expression." A.B. had not "been moving toward" her before she felt the cut, nor had he "raised his hands in any way." He "wasn't making any arm movements," but instead engaged in a "mutual verbal argument" with Amin. Mother noted A.B.'s mood changed and he "became concerned" when he realized he had cut her. The trial court expressly found mother a credible witness who "c[a]me to court and in a very difficult situation she truthfully testified."

The cut was not deep, but she bled "a lot because I have — I take anti-coagulant." Amin came up to her and held her hand tight to stop the bleeding. As they proceeded down the stairs, A.B. followed them, still angry and upset at Amin, and as

3

mother and Amin exited into the garage, A.B. slammed the door to the garage on Amin's leg, causing a cut and a bruise on one of Amin's toes. Mother and Amin departed in her car and returned later in the day.

In the evening, A.B. called the sheriff's department, expressing concern that he would not have a place to sleep that night. A.B. met the deputy outside his home, and after the deputy placed him in her patrol car, she went inside the home, spoke to mother, and then returned and read A.B. his *Miranda* rights. The deputy testified at the wardship hearing as follows: "The minor told me that he doesn't like his mother's boyfriend, her boyfriend at the time, and that he heard his mom and the boyfriend talking about him in their bedroom this morning. And he got extremely angry, went into that bedroom, yelled at them, left the bedroom, went back into his own room, [and] retrieved a knife. And he told me that he, quote, 'threatened the hell out of him,' meaning the boyfriend."

After A.B. told the deputy it was "the biggest knife he had," she retrieved it and found it was a "folding knife" with a four-inch blade. She elaborated that A.B. "said that he went and got the knife and began threatening the mom's boyfriend with it. And during the altercation, his mom stepped in between him and her boyfriend to protect her boyfriend and that he must have stabbed her with it."

In argument on the wardship petition, the prosecutor summarized his case this way: "Here the minor has confessed to grabbing a knife with the intent to threaten Amin, the boyfriend. So he basically has confessed to count 4, which would be the brandishing. . . . [¶] And as for the 245(A)(1) [aggravated assault], . . . the evidence here shows the minor committed an act that would likely and probably have resolved [*sic*] in a battery *by grabbing a knife*. With [*sic*: garbled] the evidence established by the mom's testimony is that she put her arm up. As she put her arm up, the minor had the knife out, resulting in a cutting motion — well, strike that. Not a cutting motion, but resulting in a cut. [¶] Based on all of the evidence presented to[] the court and based on the minor's

4

admissions and the testimony of the mother, the case has been proven beyond a reasonable doubt." (Italics added.)

The prosecutor later added: "And as the court is aware, you don't have to intend to commit a battery. You just have to commit an act that could likely and probably result in a battery. I should say, you don't have to intend to commit an assault. So whether or not the minor intended to cut his mom, the fact that he was *waving a knife around* in such close proximity to his mom was an act that satisfies the elements of assault with a deadly weapon." (Italics added.)

The juvenile court observed that A.B.'s "own statements" established the brandishing allegation because "threatening the hell out of somebody with a knife is sort of the essence of a brandishing, as alleged in count 4." The court also concluded: "Whether or not it's an assault, I think, is also proven sufficiently by the youth's statement that he 'threatened the hell out of' the boyfriend and that we have either a natural and probable consequence of that threatening, with his mother being there to defend, that she would become a victim, or we have, I think — and I think it really better fits this theory of just the transferred intent in that the assault was really occurring on Amin at that time, but the mother jumping in between and holding her arms out. And I think it's apparent [that when] she was trying to keep the two of them apart, from her testimony, that the assault occurred." The trial court sustained the wardship petition, and A.B. now appeals.

II

DISCUSSION

A.B. challenges the sufficiency of the evidence to support the finding he committed aggravated assault against his mother.Substantial evidence is defined as evidence that is reasonable, credible, and of solid value. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) A reviewing court must accept logical inferences the trier of fact may have drawn from the circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th

5

342, 396.) "'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence."' [Citation.]" (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.)

Here, the prosecutor assumed A.B. cut his mother while "waving a knife around" to threaten Amin, and it appears the trial court was swayed by that characterization to conclude A.B. committed an aggravated assault on his mother in the process of assaulting Amin. The evidence, however, does not support a finding of aggravated assault.

Section 240 defines "assault" as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The injury may be accomplished by the "least touching," and the evidence must "demonstrate that the defendant willfully or purposely attempted a 'violent injury' or 'the least touching,' i.e., 'any wrongful act committed by means of physical force against the person of another.'" (*People v. Coluntuono* (1994) 7 Cal.4th 206, 214 (*Coluntuono*).) An assault is aggravated when the defendant uses a deadly weapon to commit it. (§ 245, subd. (a)(1).)

Assault is a general intent offense. "'[A] general intent to attempt to commit the violence is sufficient to establish the crime.'" (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1737 (*Lee*).) Put another way, "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790 (*Williams*).)

A defendant need not connect the dots from his act and knowledge of the underlying facts to a subjective realization his act likely will result in injury. Assault "does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." (*Williams*, *supra*, 26 Cal.4th at p. 790.) Consequently, the

6

doctrine of transferred intent developed to meet the requirement of a specific intent to kill in murder and attempted murder cases involving unintended victims does not apply in assault cases. (*Lee*, *supra*, 28 Cal.4th at p. 1737 ["the doctrine of transferred intent does not apply at all in an assault case"].) This follows because "there is no specific intent to transfer." (*Ibid.*)

Instead, the defendant commits assault "if he intended to commit a successfully completed act, such as firing a gun, the direct, natural and probable consequences of which applied physical force upon or injury to another." (*Lee*, *supra*, 28 Cal.4th at p. 1738.) Accordingly, a defendant committing assault may have unintended or nontargeted victims. "The defendant need not intend to strike any particular person to be guilty of . . . assault. Rather, when the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group." (*People v. Riva* (2003) 112 Cal.App.4th 981, 999, fns. omitted.)

The same applies for unintended victims of a knife assault, as illustrated in *People v. Tran* (1996) 47 Cal.App.4th 253. There,a knife-wielding defendant chased a man who fled with his infant son in his arms. The jury convicted the defendant of two counts of assault with a deadly weapon, and the reviewing court affirmed, explaining: "We read *Colantuono* to mean that an intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge. Defendant need not have specifically intended to injure baby Jackson; chasing Sang Ngoc Tang (who was carrying Jackson) and wielding a large knife conveyed an intent to cause injury with the knife. It is not reasonable to insist that defendant desired only to injure the father, and thus was not liable for the assault on the son. Surely a knife attack on the father could foreseeably have wounded the baby." (*Id.* at p. 262.)

But a potential for "'the least touching'" resulting in "violent injury" necessary for assault (*Coluntuono*, *supra*, 7 Cal.4th at p. 214; § 240) is not a natural and

7

probable consequence of mere brandishing. As noted, the prosecutor assumed brandishing involved "waving" or otherwise moving a knife or gesturing with it. Such motions foreseeably could result in contact and injury to a nearby person in some circumstances. But contrary to the prosecutor's assumption, brandishing actually applies to "[e]very person who, except in self-defense, in the presence of any other person, draws or *exhibits* any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel . . . ." (§ 417, subd. (a)(1), italics added.)

Merely exhibiting a knife, even in a threatening manner, does not by itself support an inference that, as a natural and probable consequence, the knife will puncture or slice *someone's* body. To assume otherwise would be unwarranted and transform an accidental knife injury into a crime. Only in Hollywood and some literature could one make this inference. (See Dershowitz, Life is Not a Dramatic Narrative, in *Law's Stories: Narrative and Rhetoric in the Law* (Peter Brooks & Paul Gewirtz eds., Yale University Press, 1996), at p. 100 [suggesting that Anton Chekhov once told a writer, "If in the first chapter you say that a gun hung on the wall, in the second or third chapter it must without fail be discharged"].)[1]

The Attorney General acknowledges that brandishing is not enough. But like the prosecutor, she surmises facts that are not in the record and speculative inferences that do not support the judgment. She notes correctly that after A.B. "intentionally grabbed the knife to threaten Amin with it, [A.B.] followed Amin to the staircase and continued to threaten him with it[.]" But the Attorney General without basis suggests mother interrupted an ongoing assault A.B. committed against Amin. She

---

[1] Dershowitz thus observed, "In Chekhovian drama, chest pains are followed by heart attacks, coughs by consumption, life insurance policies by murders, [and] telephone rings by dramatic messages. [But] [i]n real life, most chest pains are indigestion, coughs are colds, insurance policies are followed by years of premium payments, and telephone calls are from marketing services." (*Id.* at pp. 100-101.)

states:  "While striking his mother was unintended, his assault [on Amin?] was intentional [because] he was *heading for Amin* with his knife, *which* he knew *would probably result in the application of physical force against Amin* when his mother jumped in the way."  (Italics added.)

But mother testified unequivocally that A.B. was not moving at the time she received her wound.  The prosecutor elicited that mother loved her son and did not want him prosecuted, but neither the prosecutor nor the court could infer from these sentiments that A.B. was moving towards Amin, let alone that he was doing so with the intent to assault Amin.  The court relied on A.B.'s admission he "threatened the hell out of" Amin, but there was no evidence A.B. did so physically or did so at the time mother was cut.  Mother testified the altercation was verbal, not physical, and that, in the moments before she was stabbed, she had not seen A.B.'s arms raised, nor a knife in his hand.

While displaying a knife is a physical act, even when coupled with threats, the act constitutes brandishing (§ 417, subd. (a)(1)), not assault.  Without motion, there was simply no "present ability" for A.B.'s knife to contact Amin to cause the touching and "violent injury" that would support an assault.  (§ 240.)  A.B. did not put mother's arm in motion or make any motion with the knife when she was cut.  While the knife *did* contact A.B.'s mother, *he* did not move it to strike her and cause her injury.  It is a speculative leap to assume that when A.B. displayed his knife — but stopped pursuing Amin and remained on the second floor, engaging only in a verbal argument as Amin descended the stairs — that as a direct, natural and probable consequence someone would be stabbed.  Life is not a Chekhov play.  A series of several further events and actions had to occur after A.B. exhibited the knife, coalescing in an unfortunate result.  A.B. admitted he displayed the knife and threatened Amin with it, but that was brandishing, not assault.

9

## III

## DISPOSITION

The judgment is reversed and remanded for a new wardship hearing.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.