Filed 9/28/21  P. v. Miranda CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074974 |
| v. | (Super. Ct. No. SWF1807757) |
| ADRIAN MARCUS MIRANDA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Steven G. Counelis, Judge.  Affirmed.

Marta I. Stanton under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene Sevidal and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

Defendant and appellant, Adrian Miranda, and his younger brother, Alexander Miranda (Alex)[1] assaulted their father and forced him to stay seated in a chair. Defendant appeals from the judgment entered following jury convictions for assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)[2]; count 1) and false imprisonment (§ 236; count 2). The jury also found true allegations that defendant personally used a firearm when committing both offenses (§ 12022.5, subd. (a)). The trial court ordered defendant placed on five years of probation on various terms and conditions, including serving 364 days in local custody.

Defendant contends his due process rights were violated because there was insufficient evidence to support his conviction for assault with a semiautomatic firearm. Defendant also contends the trial court abused its discretion in admitting into evidence irrelevant and unduly prejudicial photographs of three firearms recovered from defendant's truck. We reject defendant's contentions and affirm the judgment.

---

[1] Alex is not a party to this appeal.

[2] Unless otherwise noted, all statutory references are to the Penal Code.

## II.

## FACTS

At the time of the charged offenses on November 1, 2018, defendant and Alex, were living with their father, I.M., and mother. Alex was 23 years old and defendant was almost 27 years old. Defendant had recently moved back home.

I.M. stated during his recorded statement to Sheriff's Deputy Ennis that Alex was acting strangely when Alex and defendant arrived home together on Halloween evening. Alex asked I.M. why there were so many people coming and going from their home. I.M. explained they were trick or treaters. Unconvinced, Alex responded, "'Why you tryin' to set us up?'" Alex brandished an AR-15 rifle. Enraged, I.M. told Alex, "'Get the f—in' sh-t away, there's f—in' people everywhere, there's trick or treaters, what the hell is your f—ing problem?'" In response, Alex put the gun back in defendant's truck and said, "'I just want to make sure you guys are safe.'"

The next morning, defendant and Alex gave I.M. a hug, told him they loved him, and said they should all have dinner together that night. Later that day, at about 6:00 p.m., I.M. got into an altercation with Alex and defendant. I.M. smelled cigarette smoke entering the house through a window while he was eating at the dining room table. I.M. loudly complained and told defendant and Alex to go elsewhere to smoke. I.M. then received a text message from his wife, asking why Alex was calling her while she was at work.

I.M. asked Alex and defendant why they were contacting their mother at work. They responded by asking I.M. why their mother was contacting I.M. and not them. They accused I.M. of "doing something to their mom" and demanded to know where she was. When I.M. showed his sons their mother's text and explained why she had called him, Alex slapped I.M.'s phone out of his hand and said, "[W]e don't want to hear that s—t from you." Either Alex or defendant told I.M., "'You better hope that . . . she's okay and she comes home or else you're gonna f—in' end up dead.'" Alex might have then pushed I.M.

Deputy Ennis further testified that I.M. told him that I.M. followed Alex and defendant to defendant's bedroom and told them he was tired of them being hostile and disrespectful toward him. I.M. said he was going to call the police. When he pulled out his cellphone, Alex tried to grab it, pushed him against the bedroom wall, and started hitting him. Defendant joined the fight. I.M. made his way from the bedroom to the living room while his sons chased him, punching him and trying to get his other phone. Defendant and Alex eventually took I.M.'s second cellphone, wallet, and keys. I.M. fell down, cutting his forehead on a cabinet as he fell. Alex fell on top of I.M. and they wrestled on the floor. Defendant separated Alex and I.M.

After I.M. and Alex stood up, defendant placed a chair in the middle of the living room and told I.M., "'Sit down. You aren't going anywhere.'" I.M. sat down in the chair and then ran for the front door. Alex stopped him near the front door, slammed him against the wall, began choking I.M., walked him back to the chair in the center of the

4

living room, and placed him in a chokehold.  Defendant retrieved a 1911 Sig Sauer .45 caliber semiautomatic handgun from his bedroom and returned to the living room, holding the gun at his side.  Defendant raised the gun, holding it at eye level, inserted a magazine into the handle, chambered a round, and lowered the gun to his side.  Defendant told I.M., "[S]it the f—k down or else."  I.M. complied.

Defendant and Alex paced back and forth, making menacing statements.  Defendant asked Alex if he had any zip-ties to tie I.M. to the chair.  I.M. said all the zip-ties were gone.  Either defendant or Alex said, "'It doesn't matter, this chair fits perfect in the tub and mess is easy cleaned.'"  One of I.M.'s sons went to the back door to check to make sure it was locked, and the other son walked towards the bedroom.  At that point, I.M. ran out the front door and yelled for help.  Alex briefly chased after him until I.M. reached the street.  Alex then ran back inside as I.M. ran down the street.

While running, I.M. fell and scraped his knees and elbows.  He got up, flagged down a driver, and asked the driver, J.V., to call 911.  J.V. testified that he noticed a cut on I.M.'s forehead.  I.M. told him that one of his sons hit him on the head with a gun.  I.M. told J.V. that both his sons had guns. While J.V. spoke to the 911 dispatcher, defendant and Alex sped off in defendant's truck.  Shortly thereafter they were stopped and arrested.  When Deputy Ennis arrived at the scene, I.M. told him he feared that if defendant and Alex were not apprehended, "they would come back to the house and hurt him or his wife."

Sheriff's Deputy Holtkamp and Deputy Ennis found two disassembled AR-15 rifles and a Springfield XD semiautomatic handgun inside a toolbox in the bed of defendant's truck. The deputies also found in the truck cab a 1911 Sig Sauer inside an unlocked gun case. It was between the driver and passenger seats. Deputy Ennis interviewed Alex shortly after his arrest. The recorded interview was played for the jury. I.M. was also interviewed that same evening. Both interviews were recorded. Deputy Ennis testified that defendant and Alex were under the influence of a stimulant drug. Alex and defendant tested positive for amphetamine and methamphetamine. The forensic toxicologist testified that methamphetamine can cause hallucinations, paranoia, and aggressive and impulsive behavior. Defendant admitted that he had used methamphetamine during the 24 hour period preceding the charged offenses.

A. *Alex's Trial Testimony*

Alex testified to the following facts. The day of the charged offenses, Alex drove defendant's truck to the store. During that time, Alex took the Sig Sauer out of the toolbox in defendant's truck, "just to have it." Alex did not tell defendant he took it. Alex loaded the gun with a magazine. Defendant did not know Alex put the gun in his bedroom or that it was there during their altercation with I.M.

Around 4:00 p.m., Alex and defendant were smoking on the patio at their home. I.M. complained. Alex took offense. Then defendant and Alex started thinking their mother should have been home by then. Alex called her but she did not answer. When I.M. asked Alex why he was calling his mother, Alex responded with a profane tirade.

6

Alex thought I.M. had done something to his mother. I.M. said, "'oh, you're tripping,'" and told Alex he was going to call 911. Alex knocked I.M.'s cellphone out of his hand. During this time, defendant was in the backyard.

While in the living room, Alex started punching I.M. I.M. pulled out another cellphone, which Alex took away from him. I.M. kept trying to run out the door, saying he was going to call the police. Alex chased after him and grabbed him because Alex did not want I.M. to call the police. While Alex and I.M. were punching each other, defendant came inside. Alex had I.M. in a chokehold on the ground. Defendant pulled the two apart. Alex told defendant to stay out of it because it was between Alex and I.M. There was blood everywhere because Alex's stitches on his hand split open. I.M. only had a small cut above his eyebrow from the fight.

Defendant went back to his bedroom while Alex and I.M. continued to fight. Alex put I.M. in a chair in the middle of the living room. I.M. seemed to have given up fleeing. Alex wanted to keep him there until his mother got home from work at around 7:00 p.m. If she came home, Alex was going to release I.M. Because Alex was on drugs, he thought I.M. had done something to his mother. While I.M. was cleaning up the blood on the carpet, defendant entered the living room and started talking to Alex, who was in the kitchen getting water. When they looked up, I.M. was running out the door. Alex ran after him and tried to drag him back inside. When defendant saw Alex grabbing I.M. in the street, defendant looked shocked and upset. Alex released I.M. I.M. ran away toward a passing truck. Alex denied defendant hit I.M. during the incident.

7

Alex went inside and asked defendant to drive him to his uncle's house. Unbeknownst to defendant, Alex took the Sig Sauer with him. While driving around for a couple of hours, law enforcement pulled them over. As they were being pulled over, Alex pulled out the Sig Sauer, ejected the magazine, and put the gun in the case between them. This was the first time defendant became aware Alex was in possession of the gun. Defendant became angry when he learned of this.

Alex pled guilty to aggravated assault, dissuading a witness, and false imprisonment of his father. Alex admitted that he and defendant had smoked methamphetamine during the past couple of days, including Halloween night and the next day.

III.

SUFFICIENCY OF EVIDENCE OF ASSAULT

WITH SEMIAUTOMATIC FIREARM

Defendant contends his due process rights were violated because there was insufficient evidence supporting his conviction for assault with a semiautomatic firearm. Defendant argues the prosecution and defense witnesses consistently testified that defendant never pointed a gun at I.M. or used it to hit him. We conclude there was substantial evidence to support defendant's conviction.

A. *Standard of Review*

In reviewing the sufficiency of evidence, "we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to

8

determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 (*Guerra*).)

This same standard of review applies to cases founded primarily on circumstantial evidence. (*Guerra*, *supra*, 37 Cal.4th at p. 1129.) "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam* (2002) 28 Cal.4th 107, 143.) We do not reweigh evidence or reevaluate a witness's credibility. (*Guerra*, *supra*, at p. 1129.)

B. *Law Applicable to Assault with a Semiautomatic Firearm*

Assault with a semiautomatic firearm is defined in section 245, subdivision (b) as "an assault upon the person of another with a semiautomatic firearm." This definition has two elements: (1) the assault, and (2) the means by which the assault is committed. (§ 245, subd. (b).) An assault under section 240 is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Thus, "a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*People v. Williams* (2001) 26 Cal.4th 779, 788.) "Although temporal and spatial considerations are relevant to a defendant's 'present ability' under section 240, it is the

9

ability to inflict injury on the present occasion that is determinative, not whether injury will necessarily be the instantaneous result of the defendant's conduct." (*People v. Chance* (2008) 44 Cal.4th 1164, 1171.)

C. *Discussion*

The prosecution sufficiently established that defendant committed an assault with a semiautomatic firearm. Substantial evidence demonstrated he had the intent to commit an act which, if completed, would, as a direct, natural and possible consequence, injure I.M. (*People v. Williams*, *supra*, 26 Cal. 4th at p. 788.) Such evidence included testimony defendant was holding a Sig Sauer .45 caliber semiautomatic handgun in the presence of I.M. Defendant argues that being armed with a gun is not enough to support a conviction for assault with a semiautomatic firearm. He claims there was undisputed evidence he held the gun at his side, pointed down towards the ground and therefore did not commit an assault.

We disagree. There was more than sufficient evidence to support defendant's conviction for assault. Such evidence includes J.V. and I.M.'s recorded 911 call, during which J.V., in the presence of I.M., told the dispatcher that he had just seen two men with guns (defendant and Alex) get into a truck and drive away. In response to the dispatcher asking if the men waived the guns at anyone, J.V. asked I.M. if they threatened him. I.M. said, "Yeah." J.V. then told the dispatcher, "Yeah he said they did. He said they hit him. They pistol whipped him. They hit him with a gun in the head." J.V. further told the dispatcher the two perpetrators were I.M.'s sons. J.V. added that I.M. had a little cut on

10

his forehead, which I.M. had said he got when his sons hit him with a gun. While J.V. was talking to the dispatcher, I.M. told the dispatcher that his sons hit him with a gun "[b]ecause I was tryin' to make a phone call to my wife to tell her, uh, that they were acting up and getting all crazy again."

J.V. testified that his statement to the dispatcher that I.M. was hit in the head with a gun was based on information I.M. had told him. I.M. had told him he had been "pistol whipped." J.V. stated that those were the words I.M. had used. Even though I.M. denied at trial that either of his sons hit him with a gun, J.V.'s recorded 911 call and testimony provided substantial evidence that I.M.'s sons hit him with a gun. Furthermore, there was evidence that defendant, not Alex, was in possession of a gun during the altercation. The jury could thus have reasonably found that defendant assaulted I.M. with a gun. Although I.M. and Alex denied this, they, as family, had motivation to minimize defendant's culpability. Furthermore, because Alex had already pleaded guilty to assaulting I.M., he was not exposed to liability by taking the blame for the assault.

In addition, there was substantial evidence defendant committed assault with a semiautomatic weapon based on I.M.'s recorded statement. Deputy Ennis also testified that I.M. told him that, while Alex was struggling to force I.M. to sit in the chair in the living room, defendant returned to the living room from the bedroom hallway, brandishing a Sig Sauer. I.M. said defendant held the gun at his side, in I.M.'s plain view, popped a magazine into the gun's handle, and chambered a round. Defendant then told I.M. to "[S]it the f—k down or else." Out of fear of being harmed, I.M. complied.

11

I.M.'s statement to Deputy Ennis and Deputy Ennis's testimony provided substantial evidence supporting the jury's finding that defendant assaulted I.M. with a semiautomatic firearm. There was evidence that, when defendant entered the living room with the Sig Sauer, loaded it, and told I.M. to sit down "or else," defendant had "'attained the means and location to strike immediately.'" (*Chance*, *supra*, 44 Cal.4th at p. 1174.)

As the California Supreme Court in *Chance* explained, "[i]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (*People v. Chance*, *supra*, 44 Cal.4th at p. at 1172.) "[A]ssault does not require a direct attempt at violence. [Citation.] 'There need not be even a direct attempt at violence; but any indirect preparation towards it, under the circumstances mentioned, such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' [Citations.]" (*Ibid*.) "[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Ibid*.)

In *People v. Escobar* (1992) 11 Cal.App.4th 502, 505, the court held there was sufficient evidence to support a conviction for assault with a firearm where the defendant did not inflict injury on the victim. The court in *Escobar* concluded the evidence showed that the victim was aware that the defendant was holding the gun inside a purse. The

victim saw the defendant with his hand in a leather briefcase, and heard a clicking sound like the cocking of a gun. The *Escobar* court further concluded that the victim perceived the defendant's intent to violently injure the victim and that the defendant had the present ability to do so. The *Escobar* court held that this evidence established more than mere preparation. (*Id*. at p. 505.)

Defendant argues the instant case is factually distinguishable from *Escobar* because I.M. did not perceive that defendant pointed a firearm at him or use the firearm to hit I.M. Defendant asserts that the prosecution's witnesses testified that defendant never pointed the gun at anyone. He merely held it at his side. But there was also evidence defendant hit I.M. with the gun. In addition, there was evidence defendant loaded the gun in I.M.'s presence and then, while holding the gun, ordered him to sit down "or else." Defendant is urging this court to disregard this evidence and improperly reweigh the evidence in his favor, which this court will not do. We will not reverse the judgment "simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam*, *supra*, 28 Cal.4th at p. 143.) We do not reweigh evidence or reevaluate a witness's credibility. (*Guerra*, *supra*, 37 Cal.4th at p. 1129.)

Here, there was substantial evidence defendant equipped and positioned himself to carry out a battery on I.M. with the semiautomatic gun and, therefore, had the present ability required by section 240 to inflict injury on I.M. during the charged assault offense. We thus conclude there was substantial evidence to support defendant's conviction for assault with a semiautomatic firearm.

13

IV.

ADMISSIBILITY OF FIREARM PHOTOS

Defendant contends the trial court abused its discretion in allowing the prosecution to introduce highly inflammatory photos of three firearms that were not used in the charged offenses.

A. *Procedural Background*

During a hearing on motions in limine, defendant moved to exclude photos of three firearms found in defendant's truck on the grounds the photos were not relevant and unduly prejudicial. Deputies found the photographed guns in the bed of defendant's truck, in a toolbox. The three guns included two rifles and a handgun. The Sig Sauer, used in the charged offenses, was found in the truck cab.

The deputies took photos of the guns as they appeared when the deputies first found them.[3] There were no photos of just the Sig Sauer. Defense counsel objected to showing the jury photos of the other guns and suggested the prosecution take a photo of the Sig Sauer and use it. Defense counsel told the court she did not intend to argue that the gun was not found in the truck, and defendant was not contesting that deputies found the gun in defendant's truck. The trial court stated that the photos of the Sig Sauer, which the court thought were photographed with the other guns in the truck, was highly

---

[3] There appears to have been some confusion during the in limine hearing as to whether the Sig Sauer was found with the other guns that were photographed. According to defense counsel, the Sig Sauer was not with the three photographed guns in the toolbox. Later testimony by Deputies Ennis and Holtkamp revealed that the Sig Sauer was found in a different location in defendant's truck.

relevant to prove where the Sig Sauer was found. Therefore the court stated it intended to allow the photos. In response, defense counsel said she was willing to stipulate that the gun was found in the truck.

The prosecutor argued that excluding the photos would be prejudicial because doing so would sanitize the case in defendant's favor. The prosecutor further argued the photos enhanced the credibility of I.M.'s statement to Deputy Ennis, in which he said that his sons had two AR-15 rifles with them when they got in defendant's truck. The photos corroborated that the guns were in defendant's truck. The photos also corroborated I.M.'s statements to Deputy Ennis, J.V., and the 911 dispatcher that his sons had guns with them in the truck. It was anticipated I.M. would not testify against defendant and, therefore, the prosecution would need to rely on I.M.'s statement to Deputy Ennis. The photos also corroborated Deputy Ennis's and J.V.'s testimony that I.M. told them his sons had guns in the truck.

After hearing argument, the trial court concluded the photos were relevant under Evidence Code section 210, to proving the location of the Sig Sauer when the deputies found it. The court also ruled the photos were not unduly prejudicial under Evidence Code section 352, because they would assist the jury in assessing the credibility of I.M.'s statements made to the deputies regarding the location of the Sig Sauer and other guns.

B. *Law Applicable to Admissibility of the Photos*

"'The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible.'" (*People v. Heard* (2003) 31 Cal.4th 946,

15

972.)  "The trial court has broad discretion in determining the relevance of evidence." (*Id.* at p. 973.)  "'[W]e rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352).  A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282.)  "'To determine whether there was an abuse of discretion, we address two factors:  (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.'" (*Ibid.*)

C. *Discussion*

Having examined the photographs, we conclude that the photographs were relevant under Evidence Code section 210, and were not unduly prejudicial under Evidence Code section 352.  Relevant evidence, as defined in Evidence Code section 210, includes "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  The photographs were relevant to assessing the credibility of I.M., Deputy Ennis, and J.V., and of I.M.'s recorded statement made to Deputy Ennis on the day of the charged offenses.  The photographs corroborated I.M.'s, Deputy Ennis's, and J.V.'s statements and testimony made regarding defendant and Alex's possession of firearms when they drove away in defendant's truck, after committing the charged crimes.

16

Defendant contends that, even if relevant, the photographs had little or no probative value relating to any issue in this case. The photographed guns did not include the Sig Sauer defendant used when committing the charged offenses. We agree that, other than being relevant as to witness credibility, the photos were not probative as to defendant's commission of the charged crimes, because there was no evidence he used the photographed guns in the crimes. The Sig Sauer used in the crimes was not shown in the two photos because it was found in a different location in defendant's truck.

Nevertheless, because the photos were relevant to witness credibility, particularly to the credibility of I.M.'s recorded statement, we conclude the trial court did not abuse its discretion in finding the photos were relevant and admissible under Evidence code section 352. Any prejudice from admitting the photos was minimal because there was other evidence establishing that Alex and defendant had multiple guns, including two AR-15s. During a recorded 911 call, J.V. stated I.M. told him his sons had multiple guns. J.V. also testified I.M. had told him this. In addition, Deputy Ennis testified I.M. told him his sons had not only the handgun, but also had two AR-15 rifles with them when they got in defendant's truck. I.M. further stated during his recorded statement that on Halloween night, defendant brandished an AR-15 rifle.

Defendant's charged crimes were far more inflammatory than the photos of the three guns found in defendant's truck. Any prejudice in showing the gun photos to the jury was thus outweighed by the probative value of the photos. We therefore conclude the trial court did not abuse its discretion under Evidence Code section 352 in allowing

17

the two photos of the three guns found in a toolbox in the bed of defendant's truck. We further conclude that, even if there was error in allowing the photos, any such error was not prejudicial. It is not reasonably probable that had the photos been excluded, the trial outcome would have been more favorable to defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## V.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

MENETREZ
J.